

## NUMBER 13-07-00651-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

LAWRENCE R. GELMAN, M.D. AND
RAYMOND BARRIE WALKER, C.R.N.A.,                    Appellants,

v.

RICARDO CUELLAR, INDIVIDUALLY AND
AS HUSBAND AND NEXT FRIEND OF
ESMELDA CUELLAR,                                    Appellees.

**On appeal from the 275th District Court of Hidalgo County, Texas.**

## O P I N I O N

**Before Chief Justice Valdez and Justices Garza and Benavides
Opinion by Chief Justice Valdez**

This is a health care liability lawsuit governed by chapter 74 of the Texas Civil Practice and Remedies Code.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001-.507 (Vernon 2005).  Appellants, Lawrence Gelman, M.D. and Raymond Walker, bring this interlocutory appeal from the trial court's denial of their motions to dismiss, which was

based on the alleged inadequacy of expert reports prepared by Hector Herrera, M.D., John Meyer, M.D., and Rikina Granger. The health care liability claims and expert reports were filed by appellee, Ricardo Cuellar, individually and as husband and next friend of Esmelda Cuellar and their three minor children. On appeal, Gelman and Walker contend that the reports are inadequate because: (1) Meyer and Granger are unqualified experts; and (2) Herrera did not specify standards of care or corresponding breaches of the standard of care as to each defendant, and does not provide proof of causation.[1] We affirm.

## I. BACKGROUND

On May 10, 2004, Esmelda Cuellar was admitted to Doctors Hospital at Renaissance because of excessive vaginal bleeding. Cuellar was administered general anesthesia while Alejandro Tey, M.D., an obstetrician-gynecologist, performed a hysteroscopy (examination of the uterine lining), dilation and curettage of the uterus, and lower abdominal laparoscopy. After the procedures, Cuellar remained unresponsive for nineteen minutes from the effects of the anesthesia, but she eventually regained consciousness. Post-operative test results revealed uterine fibroid tumors, which required surgery.

On December 3, 2004, Tey preformed a total transvaginal hysterectomy while Cuellar was under general anesthesia. Gelman was the anesthesiologist during the procedure, and he was assisted by Walker, a certified registered nurse anesthetist ("CRNA"). When the hysterectomy was preformed, Cuellar weighed two hundred and seven pounds, stood four feet and eleven inches tall, and had a body mass index of 41.6; therefore, she was classified as morbidly obese. Moreover, Cuellar smoked about one

---

[1] Appellants raise a single issue, which advances two subissues. *See* TEX. R. APP. P. 38.1(e) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

2

pack of cigarettes a day. According to Tey's medical reports, the surgical procedure went well, and Cuellar maintained steady blood pressure and pulse ratings throughout the procedure. After the procedure, Cuellar was transferred to the post-anesthesia care unit (the "PACU").

While in the PACU, hospital staff noticed that Cuellar's blood sugar was high, and the problem was treated with insulin. Between 2:45 p.m. and 4:15 p.m., PACU nurses recorded eleven instances of dyspnea and shallow breathing. At 4:15 p.m., Melissa Garcia, a PACU nurse, found that Cuellar had respiratory insufficiency and noted that "patient placed on vent due to shallow breathing." At 4:20 p.m., Cuellar began experiencing seizures, which lasted throughout the afternoon and evening. Later that day, Cuellar was examined by Carlos Vela, M.D., an internal medicine specialist, and Angel Gutierrez, M.D., a neurologist.

On December 4, 2004, a brain scan was performed, which revealed no intracranial bleeding, infract, or mass effect. The next day, Cuellar was transferred to McAllen Medical Center. She remained unresponsive throughout her hospital stay and was eventually sent to a long-term care facility. Vela's final diagnosis, as listed on the hospital's discharge sheet, was ischemic hypoxic encephalopathy.

On February 8, 2007, Ricardo Cuellar filed suit against Doctors Hospital at Renaissance, Gelman, Walker, Garcia, and Tey alleging health care liability claims. As required by Chapter 74 of the civil practice and remedies code, Cuellar submitted expert medical reports by Herrera, Meyer, and Granger. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. On June 20, 2007, Gelman and Walker each filed objections to the expert reports and moved to dismiss Cuellar's petition. Cuellar responded to the objections on August 28, 2007. On September 18, 2007, the trial court held a hearing and denied the

motions to dismiss. Pursuant to section 51.014 of the Texas Civil Practice and Remedies Code, Gelman and Walker filed this interlocutory appeal. *See id*. § 51.014(a)(9).

## II. JURISDICTION

As a threshold matter, Cuellar argues that Gelman and Walker cannot bring an interlocutory appeal from the trial court's denial of their motions to dismiss. A person may appeal from an interlocutory order issued pursuant to section 74.351 when the trial court: (1) denies the relief sought under section 74.351(b); or (2) grants the relief sought under section 74.351(l). *See id*. § 51.014(a)(9), (10) (Vernon Supp. 2007); *Olgetree v. Matthews*, No. 06-0502, 2007 Tex. LEXIS 1028, at *8-10 (Tex. Nov. 30, 2007). Cuellar argues that appellants' interlocutory appeal would be proper only under section 51.014(a)(10), which applies when an expert report is filed and the trial court grants the motion to dismiss on the basis of an inadequate report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(10). Since Cuellar filed his brief, the supreme court has held that a challenge to the sufficiency of an expert report is a challenge pursuant to section 74.351(b) that no compliant report has been served. *See Lewis v. Funderburk*, No. 06-0518, 2008 Tex. LEXIS 312, at *8 (Tex. Apr. 11, 2008). Therefore, we have jurisdiction to consider appellants' interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9)

## III. STANDARD OF REVIEW

A plaintiff asserting a health care liability claim must submit an expert report to each health care provider and defendant physician. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). A compliant expert report is defined as a written report providing a fair summary of the expert's opinions regarding the standard of care, the manner in which the care rendered by the health care provider failed to meet the standard of care, and the causal relationship between that failure and the harm claimed. *Id*. § 74.351(r)(6). The trial court

4

shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in subsection (r)(6). *Id*. § 74.351(l).

We review a trial court's decision on a motion to dismiss under section 74.351 of the civil practice and remedies code for abuse of discretion. *Estate of Regis ex rel. McWashington v. Harris County Hosp. Dist.*, 208 S.W.3d 64, 67 (Tex. App.–Houston [14th Dist.] 2006, no pet.). To constitute a good faith effort, an expert's medical liability report must establish the expert's qualifications, the applicable standard of care, how that standard was breached by the particular actions of the defendant, and how the breach caused the damages claimed by the plaintiff. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878-79 (Tex. 2001). Although an expert report need not marshal and present all of the plaintiff's proof, a report that omits any of the elements required by the statute does not constitute a good faith effort. *Id*.

### IV. ADEQUACY OF EXPERT REPORT

### A. Qualifications of Meyer and Granger

To provide a compliant report, the expert must establish that he or she is qualified to do so. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(A). An expert providing opinion testimony regarding whether a health care provider departed from the accepted standards of health care must satisfy the requirements set forth in section 74.402. *Id*. § 74.351(r)(5)(B). Section 74.402 provides:

> (b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
>
>> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant

5

health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b).

In their first subissue, Gelman and Walker contend that Granger and Meyer were not qualified to render opinions in this case. Specifically, appellants contend that Granger is not competent to provide an opinion on the care provided by Gelman because she is a nurse and cannot render an opinion as to a physician. Cuellar notes that Granger's report addresses only the quality of care provided by Garcia, a nurse, and that because Garcia is not a party to the instant appeal, Granger's qualifications are not at issue. We agree, and we find appellants' objections to Granger's report meritless. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(I) (Vernon 2005) ("[A] claimant may satisfy any requirement of this section. . . *by serving reports of separate experts regarding different physicians or health care providers* or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation.") (emphasis added).

Next, appellants assail Meyer's qualifications, claiming that because he is a neurologist, he cannot opine on the care provided by an anesthesiologist. Not every physician automatically qualifies as an expert in every area of medicine. *See Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996). However, a physician need not be a practitioner in the same specialty as the defendant to be a qualified expert in a particular case. *See id.* at 153-54; *see also Blan v. Ali*, 7 S.W.3d 741, 745 (Tex. App.–Houston [14th Dist.]

6

1999, no pet.). Under the Texas Rules of Evidence, the test is whether the offering party has established that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court. TEX. R. EVID. 702; *see also Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003). The issue before us is whether Meyer has sufficient knowledge, skill, experience, training or education to provide an opinion as to the care provided by Gelman.

Meyer received a bachelor of science degree from Trinity College, a doctorate of medicine from McGill University, spent a year as an intern at New Haven Hospital, and completed a four-year residency at Boston City Hospital, which is affiliated with Harvard Medical School. Meyer specializes in neurology, and he has published several papers concerning the effects of blood flow to the brain. In his report, Meyer agreed with Vela's diagnosis of anoxic encephalopathy, and he stated that it "occurred in the PACU resulting from respiratory arrest or hypoventilation as a complication of [Cuellar's] morbid obesity." According to Meyer, Cuellar's prognosis is bleak. Meyer's notes that "Cuellar is permanently and totally disabled and incapacitated and will remain so for the rest of her life[,] requiring 24 hour institutional care and supervision with expert respiratory and neurological care including medications for her seizure control."

Ricardo Cuellar contends that Gelman did not adequately monitor Esmelda Cuellar's breathing after her procedure and that this omission resulted in decreased blood flow to Esmelda's brain and her current condition. We conclude that Meyer's neurology experience and academic work in blood flow to the brain qualifies him as an expert in this case under the theories alleged. *See* TEX. R. EVID. 702. Appellants' first subissue is overruled.

**B.      Defining the Standard of Care, Breaches of the Standard of Care, and**

7

**Causation**

By their second subissue, appellants contend that Herrera's report is deficient because it does not set forth the specific standards of care as to each appellant, the alleged breaches, and causation. "[T]o avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879. Omission of any of the statutory elements prevents the report from being a good-faith effort. *Id*. A report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. *Id*. A fair summary sets forth what care was expected but was not given. *Id*. at 880. Identifying whether the standard of care has been breached cannot be determined absent specific information about what should have been done differently. *Id*. An expert's report must contain information on the standard of care; it is not enough for a report to contain conclusory insights about the plaintiff's claims. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

In his report, Herrera states:

> In order to minimize the risk of respiratory insufficiency post-operatively and meet the standard for post-operative care, a patient should be observed and monitored by methods (i.e., oxymeter, EKG, blood pressure) taking into account the patient's medical condition. Attention should be given to monitoring oxygenation, ventilation, circulation, and the level of consciousness. Furthermore, when an obese patient is intubated and breathing spontaneously as was Mrs. Cuellar, the patient's respiratory efforts must be directly observed continuously. Their abdominal girth and chest size depress all repiratory efforts. The patient is not able to expand [her] chest as a normal person can. Furthermore, the drives given intra-operatively can accumulate in adipose tissue and result in prolonged awakening following an operation. These types of patients quickly develop respiratory insufficiency. A competent anesthesiologist easily recognizes these problems and

8

develops post-operat[ive] plans in conjunction with the CRNA and PACU nurse so that the patient does not develop respiratory insufficiency. Examples include limiting intravenous drugs which can depress the respiratory system and accumulate in adipose tissue, place the patient at 30 degrees upright while supine in order to use gravity to aid in lung expansion, chest ausculation and secretion clearance.

The report does not note whether any of the "post-operative plans" were developed or implemented. It further states:

Ray Walker CRNA, provided general anesthesia for the hysterectomy. He took Mrs. Cuellar to the PACU intubated, unresponsive, and breathing spontaneously. Mrs. Cuellar was brought from the operating room still asleep from anesthetic. And because of Mrs. Cuellar['s] status, it was Mr. Walker's responsibility to insure she maintained adequate oxygenation post-operatively until she had awoken from the anesthetic. The PACU nurse had the duty to continuously monitor Mrs. Cuellar moment to moment while in the PACU, assist in her care, and communicate immediately all abnormalities with Dr. Gilman [sic] and Mr. Walker regarding Mrs. Cuellar's status. . . . Dr. Gilman, [sic] as the anesthesiologist who evaluated Mrs. Cuellar pre-operatively and supervising the PACU, had the ultimate responsibility for Mrs. Cuellar's care while in the PACU. Dr. Gilman's [sic] responsibilities included providing general medical supervision and coordination of Mrs. Cuellar's care throughout the PACU stay. He should have continuously remained close by Mrs. Cuellar attending to the following issues:

1. Post-operative obese patient.
2. Patient in PACU intubated.
3. Patient unresponsive, breathing spontaneously and not awake from the anesthetic.
4. Documented respiratory insufficiency by PACU nurse.

. . . .

Had Mrs. Cuellar been properly monitored and timely treated post-operatively with aggressive respiratory care, she would not have developed respiratory insufficiency. And this respiratory insufficiency was the cause of her anoxic brain damage.

Herrera's report represents an objective, good-faith effort to comply with the definition of an expert report provided in subsection (r)(6). TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). The report discusses the standard of care, breach, and causation with sufficient specificity to inform Gelman and Walker of the conduct Ricardo Cuellar has

9

alleged and to provide a basis for the trial court to conclude that the claims have merit. *See Palacios*, 46 S.W.3d at 875. The report offers more than conclusory statements about the standard of care, as each sets forth what procedures were expected but were not performed. *See id*. at 879, 880. The report explains the standard of care regarding patients presenting similar respiratory problems after surgery and links Gelman's and Walker's alleged failure to monitor and respond to Cuellar's condition. Considering what was within the four corners of Herrera's report, we conclude that the averments and opinions are sufficient. Appellants' second subissue is overruled.

## V. CONCLUSION

The trial court's order is affirmed.

_____
ROGELIO VALDEZ
Chief Justice

Opinion delivered and filed
this the14th day of August, 2008.

10