

# NUMBER 13-07-121-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RENAISSANCE SURGICAL CENTERS - SOUTH
TEXAS, L.L.P., RENAISSANCE SURGICAL
CENTERS - SOUTH TEXAS, INC., RENAISSANCE
SURGICAL CENTER SOUTH TEXAS, L.L.P., AND
RENAISSANCE HEALTHCARE SYSTEMS, INC.,                    Appellants,

v.

EVA NELDA JIMENEZ, INDIVIDUALLY AND AS
EXECUTRIX OF THE ESTATE OF MARIO M.
JIMENEZ, M.D., NATALIA CELESTE JIMENEZ,
AND ANTONIO MANUEL JIMENEZ,                              Appellees.

On appeal from the 332nd District Court of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Justices Yañez, Rodriguez and Benavides**
**Memorandum Opinion by Justice Benavides**

Appellants, Renaissance Surgical Centers–South Texas L.L.P., Renaissance

Surgical Centers–South Texas, Inc., Renaissance Surgical Center South Texas, L.L.P.,

and Renaissance Healthcare Systems, Inc. (collectively "Renaissance"), appeal the denial of their motion to dismiss health care liability claims brought by appellees, Eva Nelda Jimenez, individually and as executrix of the estate of Mario M. Jimenez, M.D., Natalia Celeste Jimenez, and Antonio Manuel Jimenez (the Jimenezes). By a single issue, Renaissance argues that the expert reports submitted by the Jimenezes do not constitute a good-faith effort to comply with the expert report requirements. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (l), (r)(5)-(6) (Vernon 2005). We affirm, in part, and reverse and remand, in part.

## I. Background

Mario Jimenez, M.D., underwent surgery for liposuction, abdominoplasty, and umbilical hernia repair on April 13, 2004. The surgery was performed by Rafael A. Avila, M.D., at Renaissance's ambulatory surgical center in Edinburg, Texas. As part of the surgery, Jimenez required anesthesia, including epidural Duramorph. The manufacturer's warning states that after receiving Duramorph, the patient should be observed in "a fully equipped and staffed environment for at least 24 hours after the initial dose." Nevertheless, Jimenez was discharged and allowed to return home within the first 24 hours after his surgery. Within 24 hours after his surgery, Jimenez suffered symptoms of fat emboli and died.

On June 26, 2006, the Jimenezes brought suit against Renaissance,[1] Avila, and the

---

[1] The Jimenezes initially brought suit against eight different entities: (1) Edinburg Surgery Center, L.P. d/b/a Surgical Center of South Texas; (2) Edinburg Ambulatory Surgical Center, Inc.; (3) Renaissance Surgical Centers–South Texas, L.L.P. d/b/a Renaissance Surgical Center of South Texas; (4) Renaissance Surgical Centers–South Texas, Inc.; (5) Renaissance Surgical Center South Texas, L.L.P. d/b/a/ Renaissance Surgical Center of South Texas; (6) Renaissance Surgical Centers, Inc.; (7) Universal Health Services, Inc.; and (8) Renaissance Health Care Systems, Inc.

The Jimenezes later nonsuited three of those entities: Edinburg Surgery Center, L.P. d/b/a Surgical Center of South Texas; Edinburg Ambulatory Surgical Center, Inc.; and Universal Health Services, Inc. Four

nurses, Tammy Rivera, RN, Mary Barrerra, RN,[2] and John C. Rhinehart, CRNA,[3] alleging health-care liability claims. The petition specifically alleged that Renaissance "provided medical health care and treatment to Jimenez through its employees, servants, agents, and/or representatives acting in the scope of their employment of their agency with [Renaissance]." The petition alleged that Rhinehart was acting as Renaissance's employee or agent and that Renaissance was liable for his actions under the doctrine of respondeat superior. The Jimenezes also alleged direct liability theories against Renaissance for improperly discharging Jimenez and for negligent supervision.

On October 24, 2006, within 120 days after filing suit, the Jimenezes served three expert reports on Renaissance.[4] On November 14, 2006, Renaissance filed a motion to dismiss under section 74.351(b) of the Texas Civil Practice and Remedies Code. *Id.* § 74.351(b). Renaissance argued that the reports did not constitute a good-faith effort to comply with the definition of an expert report. *See id.* § 74.351(a), (l), (r)(5)-(6).

The Jimenezes filed a written response on December 18, 2006. In it, the Jimenezes argued that Renaissance was required to file objections to the expert reports within 21 days after they were served, as required under Texas Civil Practice and Remedies Code section 74.351(a). *Id.* § 74.351(a). They argued that a motion to dismiss did not satisfy this requirement, and therefore, Renaissance waived its objections to the sufficiency of the

---

of the remaining five entities moved to dismiss the Jimenezes claims and are parties to this appeal, as identified above. The remaining entity, Renaissance Surgical Centers, Inc., is not a party to this appeal.

[2] The Jimenezes nonsuited Rivera and Barrera as well.

[3] Rhinehart moved to dismiss the Jimenezes's claims, and the trial court denied that motion on March 22, 2007. Rhinehart has not appealed this ruling and is not party to this appeal.

[4] The reports are set out in full below, along with the relevant analysis.

reports.  The Jimenezes also argued that the three reports satisfied the expert report requirements.

The trial court held hearings on December 19, 2006 and February 1, 2007.[5]  On February 2, 2007, the trial court orally denied the motion to dismiss.  It signed a formal order denying Renaissance's motion on March 22, 2007, and this interlocutory appeal ensued.  *See id.* § 51.014(a)(9) (Vernon 2008).

## II.  Jurisdiction

We must first address our jurisdiction over this interlocutory appeal.  The Jimenezes argue that we lack jurisdiction because section 51.014(a)(9) of the civil practice and remedies code allows an appeal from an order that denies relief sought under section 74.351(b) or that grants relief sought under section 74.351(l) of the code.  *See id.*  They argue that although Renaissance asked the trial court to dismiss under section 74.351(b), in substance, Renaissance's motion complained that the reports did not constitute a good faith effort to comply with the definition of an expert report under section 74.351(l).  Because the trial court did not grant Renaissance's motion under section 74.351(l), the Jimenezes argue that we lack jurisdiction over this appeal.  *See id.*

Since the filing of the Jimenezes' brief, however, the Texas Supreme Court has rejected the Jimenezes' construction of the statutes.  *See Lewis v. Funderburk*, 253 S.W.3d 204, 207-08 (Tex. 2008).  The supreme court held that when a report is insufficient under section 74.351(l), it is the same as if a report had not been served at all, and the health care provider may move to dismiss under section 74.351(b) if a sufficient report is

_____

[5] The hearing transcripts do not appear in the record.  However, neither party argues that any evidence or arguments necessary to the resolution of this appeal were presented at the hearing.

4

not filed within 120 days after suit is filed.  *Id.*  Accordingly, we have jurisdiction over this appeal.  *Id.*

### III.  Waiver

Before we address the reports, we must also address the Jimenezes' argument that Renaissance waived any objections to the expert reports by failing to file objections within 21 days after the expert reports were served.  Texas Civil Practice and Remedies Code section 74.351(a) states:  "Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived."  TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).  The Jimenezes argue that rather than filing objections to their expert reports, Renaissance merely moved to dismiss.  According to the Jimenezes, objections are important because they allow the plaintiff to correct any deficiencies in the reports.  They argue that there is no provision in the statue that allows for the filing of a motion to dismiss as an alternative manner to address complaints as to the contents of an expert report.  They reason, therefore, that Renaissance has waived all its complaints.

The Jimenezes do not argue that the motion to dismiss was untimely; it was not.  *Id.*  Apparently, they believe that Renaissance should have filed a separate document raising objections to the report.  If the circumstances of this case were different, we might agree with the Jimenezes' reasoning.  A health care provider must raise any objections to the reports within 21 days after they are served, or any complaints are waived.  *Id.*  Furthermore, a health care provider cannot move to dismiss until the 120-day deadline for serving the reports has passed.  *Id.* § 74.351(b).  Thus, if a plaintiff chooses to serve its

expert reports well before the 120-day deadline, a health care provider must still file objections to the report within 21 days after they are served, even though a motion to dismiss cannot yet be filed. *Id.* § 74.351(a)*.* So, for example, if a plaintiff files suit on day one and serves its expert reports on day 70, the health care provider must file written objections to the report on or before day 91, even though the provider cannot move to dismiss until after day 120. *Id.* § 74.351(a). In those circumstances, the objections must necessarily be separate from the motion to dismiss. The objections, under those circumstances, allow the plaintiff to correct any deficiencies in the report and re-serve the report before the 120-day deadline. *Id.*

However, in the context of the facts of this case, the Jimenezes' arguments and reasoning do not make sense. The reports were served on October 24, 2006, exactly 120 days after suit was filed. Even if Renaissance had filed objections to the report on the day that the Jimenezes served the reports, it would have been too late to correct the reports. *See id.* Renaissance filed its motion to dismiss on November 14, 2006, which was 21 days after the reports were served.

The Jimenezes have not cited a single case that holds that a motion to dismiss in this context is an insufficient method to raise objections to the reports, nor have we located any. Moreover, the statute does not require a separate filing when the 120-day deadline has passed, and we see no reason to require one. The motion to dismiss clearly sets out Renaissance's complaints about the reports, and the Jimenezes do not suggest that Renaissance's complaints were unclear or lacked specificity. The Jimenezes were able to address all of the complaints in their response to the motion. Separately-filed objections would have served no additional purpose. *See* Tex. R. App. P. 33.1(a)(1) (stating error is

6

preserved when a timely request, objection, or motion states the grounds therefor with sufficient specificity to make trial court aware of complaint). We hold that Renaissance properly preserved its arguments as to why the reports are insufficient and did not waive error.

## IV. Expert Reports

We now turn to the substance of the reports. By a single issue, Renaissance argues that the trial court erred in denying its motion to dismiss because the Jimenezes failed to make a good-faith effort to serve "expert reports" as required by section 74.351 of the civil practice and remedies code. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (l), (r)(5)-(6).

### A. Standard of Review and Applicable law

We review the trial court's decision to deny a motion to dismiss under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877-78 (Tex. 2001). The trial court is limited to reviewing the information within the four corners of the report. *Id.* at 878. "An abuse of discretion occurs when a trial court acts in an arbitrary or unreasonable manner or without reference to any guiding principles." *Moore v. Sutherland*, 107 S.W.3d 786, 789 (Tex. App.–Texarkana 2003, pet. denied) (citing *Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex. 1999)). An appellate court may not reverse for abuse of discretion simply because it would have decided the matter differently. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex.1985).

"With respect to resolution of factual issues or matters committed to the trial court's discretion, for example, the reviewing court may not substitute its judgment for that of the trial court." *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992). The appellant must

7

"establish that the trial court could reasonably have reached only one decision." *Id.* at 840. Conversely, a trial court has no discretion in determining what the law is or in applying the law to the facts. "[A] clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Id.*

Section 74.351 requires that a plaintiff serve on each party "one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted." *Id.* § 74.351(a). An "expert report" is defined as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). A court must grant a motion to dismiss under section 74.351(b) if, after the 120-day deadline has passed, it appears to the court that the report does not represent an objective, good-faith effort to comply with the definition of an expert report. *Id.* § 74.351(l).

To qualify as a "good-faith effort," the report must "provide enough information to fulfill two purposes": (1) it must "inform the defendant of the specific conduct the plaintiff has called into question," and (2) it must "provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 879. "A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements." *Id.*

8

**B.      Vicarious Liability Claims**

The Jimenezes brought suit against Renaissance alleging that Renaissance was vicariously liable for the conduct of its CRNA, John Rhinehart.[6] To support this claim, they submitted the report of Alan R. Schneider, M.D., a board-certified anesthesiologist. It stated:

> The standard of care in this situation involving the administration of epidural or spinal preservative free morphine is what a safe, reasonable, and prudent anesthesia care provider would do when administering this drug. This includes but is not limited to avoiding its usage in contraindicated situations, insuring that no other sedative drugs are administered post operatively without the knowledge of an anesthesia care provider, and that this patient be monitored post-operatively in a skilled setting for at least 24 hours. A skilled setting would include any of the following[:] an intensive care unit, a telemetry floor, or a regular nursing floor. However, wherever this patient ends up, that location must be equipped to handle the complications and side effects that arise when morphine is administered in that fashion. These include pruritis, nausea, vomiting, sedation and respiratory depression. There is NO situation which would allow for the patient to go home on the day of surgery having received epidural morphine that very same day. I have reviewed the anesthesia record of John Rhinehart CRNA which includes the preop, intra-op, and post-operative time periods. The patient was a 49 year old male who had an elective abdominalplasty, liposuction, and umbilical hernia repair performed as an outpatient under a combination of epidural analgesia and deep sedation with periods of general anesthesia. According to the medical records he had an uneventful intra-operative and immediate post-operative course. He was discharged from the surgery center on the day of surgery.
>
> The patient received several different drugs throughout his epidural catheter including the local anesthetics Lidocaine and Marcaine, and the narcotics Fentanyl and Duramorph. All are appropriate drugs to use, however, the usage of epidural Duramorph, which is the trade name for preservative free morphine, mandates that the patient be monitored for a period of 24 hours. This monitoring needs to be in a setting that allows for the diagnosis and treatment of the complications and side effects of this drug when administered in this manner.
>
> When John Rhinehart CRNA allowed this patient to go home on the

---

[6] The Jimenezes did not submit reports addressing the conduct of Dr. Avila or the other two nurses that provided health care to Jimenez, or Renaissance's vicarious liability for their conduct. Those parties have been nonsuited.

same day as receiving epidural Duramorph, he clearly violated the standards of care necessary when administering this drug. If this patient had been monitored post-operatively in a proper setting, the symptoms he exhibited at home more likely than not would have been appreciated and treated in a more timely manner by trained professionals.

The Jimenezes limited the use of this report to their vicarious liability claims against Renaissance—they do not rely on this report to support their direct liability theories.[7]

Renaissance argues that Schneider's report merely refers to Rhinehart's actions and does not refer to Renaissance. It argues that "[w]hether or not the claims against the health care provider are brought under theories of agency or respondeat superior, they are still required to be supported by an expert report." In other words, Renaissance argues that the expert report must specifically identify Renaissance and, to the extent the claim is based on vicarious liability, explain how Renaissance is vicariously liable. Because Schneider's report does neither, Renaissance argues that the Jimenezes cannot rely on this report to satisfy the expert report requirement.

Section 74.351 requires that the plaintiff serve on each defendant whose conduct is implicated by a health-care liability claim an expert report that sets forth the standard of care, breach of that standard, and causation. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6). When a plaintiff's claim against a hospital is not for direct negligence, but is based on the conduct of an employee through the doctrine of respondeat superior, the expert report need not identify the hospital by name or include an opinion about how the employee was acting in the course and scope of employment for the hospital. *Univ. of Tex. Sw. Med. Center v. Dale*, 188 S.W.3d 877, 879 (Tex. App.–Dallas 2006, no pet.). In fact, a medical expert would not be qualified to render such an opinion on the legal issue

---

[7] It is undisputed that Schneider's report does not address Renaissance's direct liability.

10

of vicarious liability. *Id.* 879 n.1; *see also In re CHCA Conroe, L.P.,* No. 09-04-453-CV, 2004 WL 2671863, at *1 (Tex. App.–Beaumont Nov. 23, 2004, orig. proceeding) (mem. op.) ("The conduct by the hospital on which the agency relationship depends is not measured by a medical standard of care. These are principles of agency law on which no expert report is required.").  If the report identifies conduct by the hospital's employee, the hospital is implicated, and as long as the report adequately addresses the standard of care applicable to the employee, how the employee breached the standard of care, and that the breach caused the plaintiff's injury, it is sufficient as against the hospital to satisfy the expert report requirement for the vicarious liability claims. *Dale,* 188 S.W.3d at 879; *see also Casados v. Harris Methodist H-E-B*, No. 02-05-080-CV, 2006 WL 2034230, at *4 (Tex. App.–Fort Worth 2006, no pet.) (mem. op.) (holding plaintiff satisfied expert report requirements with respect to vicarious liability claims by filing expert report detailing negligence of doctors, for whose actions hospital was liable).

Renaissance cites *CHCA Mainland, L.P. v. Burkhalter* for the proposition that a report cannot merely point to an employee's negligence to satisfy the expert report requirements for a hospital, even though the hospital's liability is based on respondeat superior.  227 S.W.3d 221, 228 (Tex. App.–Houston [1st Dist.] 2007, no pet.).  In *CHCA Mainland*, the Houston First Court of Appeals stated:

> The Burkhalters argue that because they allege in their petition that Dr. Armstrong was acting as the hospital's "agent, servant, and/or employee," that "each statement regarding Dr. Armstrong may implicate Mainland." However, the Burkhalters cite no authority for the proposition that, by alleging in a petition that a doctor is acting as an "agent, servant, and/or employee" of a hospital, an expert report may be adequate under section 74.351 in regard to a hospital. Moreover, Mainland notes that "Dr. Fullerton did not state that his opinions against Dr. Armstrong would also apply against the hospital because of the Burkhalters' pleading that Dr. Armstrong was an agent of the hospital." Because Dr. Fullerton's expert report omits at least

one of the three specifically enumerated requirements of section 74.351(r)(6) in regard to Mainland, it cannot constitute an objective good faith effort to meet the statutory requirements.

*Id.; cf. Packard v. Guerra*, 252 S.W.3d 511, 531 (Tex. App.–Houston [14th Dist.] 2008, pet. filed) (holding trial court properly considered expert report by lawyer who "connected the dots" between entities and their responsibilities for health-care liability claim).

In a later opinion, however, the same court[8] held that

[w]hen a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury . . . . This includes a hospital if a plaintiff is alleging that the hospital itself was directly negligent, rather than just alleging that the hospital was liable due to vicarious liability.

*Univ. of Tex. Med. Branch v. Railsback*, No. 01-00729-CV, 2008 WL 1747902, at *3 (Tex. App.–Houston [1st Dist.] Apr. 17, 2008, no pet.). The court went on to review the expert reports submitted by the plaintiff, and it concluded that an expert report, which discussed only the standards of care, breach, and causation related to actions of a doctor and the nursing staff, was sufficient to satisfy the expert report requirement for the hospital based on the plaintiff's vicarious liability theories. *Id.* at *9 ("Dr. Ghadially informed UTMB of its vicarious liability by the failure of both Dr. Ivey and the nursing staff to properly maintain and pad the tourniquet and make sure that Railsback's peroneal nerve was carefully padded and protected.").

The Jimenezes argue that *CHCA Mainland* is distinguishable because in that case, the expert report did not set forth the standard of care, breach, or causation required for the hospital *or its staff and nurses*. *CHCA Mainland, L.P.*, 227 S.W.3d at 228. In other

---

[8] In fact, *Railsback* and *CHCA Mainland* were authored by the same justice.

12

words, *CHCA Mainland* did not hold that a plaintiff's expert report must specifically allege vicarious liability within the report. *Id.* Rather, in *CHCA Mainland*, the expert report was deficient with respect to the employee on which the hospital's vicarious liability was based. *Id.* We agree with this interpretation, and *Railsback*'s citation to *CHCA Mainland* confirms it is correct.

In *Railsback*, the court distinguished between allegations of a hospital's direct negligence and vicarious liability and cited to *CHCA Mainland* with the following parenthetical: "(holding that report did not satisfy required elements of expert report when hospital sued for negligence)." *Railsbeck*, 2008 WL 1747902, at *3. In the same citation, it referred to *Dale* with the following parenthetical: "(concluding that plaintiffs need not mention hospital in expert report when plaintiffs limited their claim against hospital to vicarious liability for employees)." *Id.* Thus, the Houston Court of Appeals has recognized that *CHCA Mainland* merely stands for the proposition that the report in that case did not satisfy all the required elements for an expert report as to the employee—not for the proposition that Renaissance urges.

Accordingly, we hold that the trial court did not abuse its discretion by relying on Schneider's report to satisfy the expert report requirements with regard to the Jimenezes' claims against Renaissance, to the extent that those claims are based on Renaissance's vicarious liability for Rhinehart's actions. Renaissance has not raised any other challenge to the sufficiency of Schneider's report in this appeal; thus, we affirm the trial court's order denying Renaissance's motion to dismiss with respect to the vicarious liability claims.

## C. Direct Liability Claims

The Jimenezes also pleaded that Renaissance was directly liable for negligently

13

discharging Jimenez and for negligently failing to supervise its employees. To satisfy the expert report requirement for these direct liability claims, the Jimenezes submitted the report of David S. Lopez, FACHE[9] on Renaissance's negligence, and the report of Jose Perez, M.D., to establish causation. First, Renaissance argues that Lopez is not qualified to render an opinion because he lacks experience in "the diagnosis, care, treatment of the illness, injury, or condition involved in the claim." Second, Renaissance argues that Lopez's report fails to set forth a standard of care for a hospital. Finally, Renaissance argues that Perez's opinion on causation is conclusory.[10]

### 1. Lopez's Qualifications

Lopez's report does not address his qualifications; rather, Lopez's qualifications are set out in the curriculum vitae that was attached to his report. The curriculum vitae indicates that Lopez is not a physician, but rather, he has a Bachelor of Science Degree in business administration and a Master of Science Degree in Health Care Administration.

Lopez currently serves as the president and chief executive officer of the Harris County Hospital District. Prior to this employment, Lopez served as the executive vice president and chief operating officer of the hospital district, and he also served as the senior executive director of the University of Texas Medical Branch at Galveston. In these positions, under his "major accomplishments," Lopez lists significant experience in the hospitals' financial management. For example, Lopez states that he developed an accountability reporting system which resulted in a reduction of overtime hours and a

---

[9] FACHE is an acronym for Fellow in the American College of Health Care Executives.

[10] Although Perez's report discusses a standard of care, the Jimenezes represented to the trial court that they were submitting Perez's report solely on the issue of causation and not to establish liability. The Jimenezes do not argue on appeal that Perez's report can be considered to establish the standard of care applicable to Renaissance.

14

reduction of man-hours, which further resulted in savings to the hospital. Additionally, he implemented an overall expense assessment program.

Prior to this experience, Lopez served as a consultant for Healthcare Services in Corpus Christi. He identifies the following experience at that job: (1) submitting an application for a Health Maintenance Organization to the Texas Department of Insurance; (2) examining the strategic direction of a rehabilitation program so as to allow the program to receive managed care reimbursement; (3) recommended methods to enhance the utilization of product lines created by MAPA;[11] (4) made recommendations to improve a home health agency's overall profits; (5) assisted the Nueces County Hospital District in transitioning from its status as a health care provider to a payer for services and represented the district at meetings with the Texas Department of Health.

Lopez's employment history continues in various administrative capacities in various other hospitals, and under each job title, he lists similar experience in the financial operation of the various hospitals. Nowhere in his resume does Lopez indicate that he has experience developing or implementing standards for discharging a patient or how to properly monitor a patient, or the standards applicable to a nurse or other employee who has discharged a patient that received an anesthetic.

We agree with the Jimenezes that the civil practice and remedies code does not require an expert opining on the negligence of a hospital to have a medical degree. TEX. CIV. PRAC. & REM. CODE ANN. § 74.402 (Vernon 2005). However, the statute requires that the expert have "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim" and

---

[11] This acronym is not explained in the record.

15

be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." *Id.* § 74.402(b)(2), (3). Lopez opined that Renaissance should have followed the package instructions for administering Duramorph by keeping Jimenez overnight for observation,[12] yet his curriculum vitae does not indicate in any form or fashion that he has "training or experience" to offer an expert opinion on this type of health care. Accordingly, there was nothing in the record to support the trial court's decision, and we hold that the trial court abused its discretion by holding that Lopez was qualified to opine on the Jimenezes' direct liability claims against Renaissance. *Walker*, 827 S.W.2d at 840. Because we hold that Lopez was not qualified to render an opinion on Renaissance's direct negligence, we need not analyze whether he properly stated the standard of care.

## 2.     Sufficiency of Perez's Opinion on Causation

Renaissance further argues that Perez's opinion on causation was conclusory and does not constitute a good-faith effort to comply with the expert report requirements. Renaissance argues that the report must detail specifically what actions could have been performed to avoid the result. It argues that Perez's report fails to identify what could have been done in the hospital setting, had Jimenez remained at the hospital, that would have

---

[12] Lopez's report states:

A review of the information provided reveals two (2) deviations from the "standard of care" generally found in health care organizations.  These are:

. . . .

    (2) The Surgical Center administered an anesthetic agent to conduct the surgical procedure.  Since the agent utilized was Duramorph, the drug information provided by the manufacturer clearly states that due to the potential risk of adverse effects "patients must be observed in a fully equipped and staffed environment for at least 24 hours after the initial dose."  In Dr. Jimenez's case this did not occur.  The Surgical Center should have followed the recommended precautions for the use of this anesthetic.

16

saved Jimenez's life.

Perez's report stated:

Based on my review of the medical records, it is my opinion, based on reasonable medical probability, that the lack of appropriate care and treatment was a direct and proximate cause of the death of Mario Jimenez, M.D. But for the inappropriate discharge of Mario Jimenez, M.D. from the ambulatory surgical center on April 13, 2004, Mario Jimenez, M.D. would not have expired on April 14, 2004. Had Mario Jimenez, M.D. been placed in a hospital setting with the ability to provide supportive therapy and care to timely treat the development of the fat emboli, it is my medical opinion that more likely than not Mario Jimenez, M.D. would have survived the episode that took his life on April 14, 2004.

Renaissance relies on *Costello v. Christus Santa Rosa Health Care Corp.* to support its argument. 141 S.W.3d 245, 249 (Tex. App.–San Antonio 2004, no pet.). In *Costello*, the trial court granted the hospital's motion to dismiss. *Id.* at 247. The expert, Dr. Schilling, opined that "[i]f this patient would have been appropriately triaged and evaluated, then in all reasonable medical probability she would have survived." *Id.* The San Antonio Court of Appeals affirmed the trial court's ruling that this statement was insufficient:

Although the Act only requires a "fair summary" of his opinions, Dr. Schilling's mere assertion that the patient would have survived is conclusory and is not sufficient. Nowhere in Dr. Schilling's report does he explain the causal connection between Christus'[s] claimed omissions (failure to appropriately triage and evaluate) and Lozano's death. Dr. Schilling offers no explanation of what medical information a more timely triage and evaluation would have revealed, nor does he state what would have been done had Christus not failed to act, what treatment would have or could have been available, that the patient was a candidate for the unknown treatment, or that the unknown treatment could have or would have been effective. Dr. Schilling's report fails to state how Christus'[s] failure to act was a substantial factor in bringing about Lozano's death and without which her death would not have occurred.

*Id.*

The Jimenezes, on the other hand, point to *Moore v. Sutherland.* 107 S.W.3d at 791. In that case, the trial court dismissed the plaintiff's claims, holding that the plaintiff's

17

expert report on causation did not constitute a good-faith effort to comply. *Id.* at 788. The expert's report stated:

> It is my opinion that Dr. Sutherland should have had a high index of suspicion for a bile duct leak due to his dissection in this region. The patient most likely developed her bile duct leak on 3/8/98 when she developed abdominal pain and an increased need for narcotics. Most surgeons would have instituted a diagnostic evaluation to rule out bile peritonitis between 3/9/98 and 3/13/98. Dr. Sutherland's failure to do so was below the standard of care. Had the diagnosis of bile peritonitis been made before discharge from the hospital, treatment would have prevented the patient's death.

*Id.* at 790. The court of appeals held that the expert's statement that, "[h]ad the diagnosis of bile peritonitis been made before discharge from the hospital, treatment would have prevented the patient's death," constituted a good-faith effort to satisfy the expert report requirement for the causation element. *Id.* at 790-91. The court held that the statement was not "a conclusion or a statement of a mere possibility . . . but is a positive statement of fact." *Id.* at 791.

As stated above, we review the trial court's decision to deny Renaissance's motion to dismiss for an abuse of discretion. *Palacios*, 46 S.W.3d at 877-78. Even if we would not have made the same decision, we must affirm the trial court's decision unless it appears that the trial court clearly failed to apply or to analyze the law correctly. *Walker,* 827 S.W.2d at 839. We agree with *Moore*'s analysis of the causation issue, and we hold that under *Moore*, the trial court did not abuse its discretion by holding that Perez's opinion on causation constituted a good-faith effort. *Moore,* 107 S.W.3d at 791. Although Perez's report did not identify the specific treatments that could have been applied to Jimenezes' fat emboli, the report states clearly that "[h]ad Mario Jimenez, M.D. been placed in a hospital setting with the ability to provide supportive therapy and care to timely treat the development of the fat emboli, it is my medical opinion that more likely than not Mario

18

Jimenez, M.D. would have survived the episode that took his life on April 14, 2004." This was certainly enough to "inform the defendant of the specific conduct the plaintiff has called into question" and "provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 879; *Moore*, 107 S.W.3d at 791; *see also Gelman v. Cuellar*, No. 13-07-00651-CV, 2008 WL 3522098, at *5 (Tex. App.–Corpus Christi Aug. 14, 2008, no pet. h.).

### 3. Appropriate Remedy

The trial court found the reports sufficient in all respects. Thus, the trial court had no reason to consider whether to grant a thirty-day extension to cure defects in the report. TEX. CIV. PRAC. & REM. CODE § 74.351(c) (allowing trial court to grant one thirty-day extension to cure a defective report). The Texas Supreme Court has held that when the court of appeals reverses a trial court's determination that an expert report is sufficient, the appropriate remedy is for the court of appeals to remand to the trial court to consider whether to grant a thirty-day extension. *See Leland v. Brandal*, No. 06-1028, 2008 WL 2404958, at *2-4 (Tex. June 13, 2008).

Because we have held that Lopez was not qualified to render an opinion on Renaissance's direct negligence and that the Jimenezes have not offered another report for this purpose, we remand to the trial court to consider whether to grant a thirty-day extension to cure this deficiency.

### V. Conclusion

We hold that the trial court did not abuse its discretion by relying on Schneider's report to satisfy the expert report requirements for the Jimenezes' vicarious liability claims. With respect to the Jimenezes' direct liability claims, however, Lopez's report did not

19

constitute a good-faith effort to comply because the report did not demonstrate that Lopez was qualified to render an opinion on Renaissance's direct liability. The Perez report, however, was a good-faith effort to satisfy the expert report requirement on the causation element. Accordingly, we affirm, in part, and reverse and remand, in part, so that the trial court may consider whether to grant a thirty-day extension to cure the deficiencies in Lopez's report.

_____
GINA M. BENAVIDES,
Justice

Memorandum Opinion delivered and
filed this the 28th day of August, 2008.