

## NUMBER 13-09-00094-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**RICARDO BARRERA, M.D.,** **Appellant,**

**v.**

**CESAR SARMIENTO, ET AL.,** **Appellees.**

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Chief Justice Valdez**

This is a health-care liability lawsuit governed by chapter 74 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001-.507 (Vernon 2005 & Supp. 2009). Appellees, Cesar Sarmiento, individually and on behalf of the estate of Esmeralda Sarmiento, Deceased, and as next friend of Juan Manuel Sarmiento, Maria Natividad Rodriguez Guillen, and Manuel Garcia Vasquez, filed suit

against appellant, Ricardo Barrera, M.D., alleging wrongful death and medical negligence. In his sole issue, Barrera contends that the trial court abused its discretion in failing to dismiss the claims because the expert report was inadequate under the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon Supp. 2009), § 74.401 (Vernon 2005). Barrera also asserts that the trial court erred in refusing to award him attorney's fees under the civil practice and remedies code. *See id.* § 74.351(b)(1). We affirm.

## I. BACKGROUND

Sarmiento filed his original petition on June 23, 2008, alleging wrongful death and medical negligence claims against Barrera, a family practitioner. In his petition, Sarmiento alleged that Barrera negligently performed a cesarean section and subsequently caused the death of Sarmiento's nineteen-year-old wife, Esmerelda. Pursuant to section 74.351 of the Texas Civil Practice and Remedies Code, Sarmiento timely served Barrera with the expert report of Bruce J. Halbridge, M.D., a board certified obstetrician/gynecologist. Barrera objected to the report and moved to dismiss on the grounds that Halbridge was not qualified and that the report failed to set forth the applicable standard of care, identify any breach of the standard of care, and establish causation. The trial court entered an order denying Barrera's Motion for Dismissal and granting Sarmiento a thirty-day extension of time to cure deficiencies in Halbridge's original report. *See id.* § 74.351(c). Sarmiento subsequently filed a supplemental expert report by Halbridge, and Barrera again objected and moved for dismissal. After a hearing on the objections, the trial court denied Barrera's motion to dismiss, and this interlocutory appeal ensued. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (Vernon 2008) (authorizing an interlocutory appeal of the denial of a motion to dismiss filed under section 74.351(b)).

2

## II. EXPERT REPORT

Barrera contends that the trial court abused its discretion by failing to dismiss the claims because the expert report was inadequate. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351, 74.401. Specifically, Barrera argues that dismissal was mandatory because the expert report proffered by the appellees was (1) authored by an unqualified expert, and (2) conclusory as to causation. *See id.* §§ 74.351, 74.401.

### A. Standard of Review

We review a trial court's ruling on a motion to dismiss a case under section 74.351 of the civil practice and remedies code for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Tesoro v. Alvarez*, 281 S.W.3d 654, 656 (Tex. App.–Corpus Christi 2009, no pet.). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to any guiding rules and principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003).

A plaintiff asserting a health-care liability claim must, within the first 120 days of suit, serve on the defendant one or more "expert reports." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). If the plaintiff timely serves a report on the defendant, the trial court cannot dismiss the lawsuit unless the proffered report does not represent an objective good faith effort to comply with the statutory requirements for such a report. *See id.* § 74.351(l). "To constitute a good faith effort, an expert's medical liability report must establish the expert's qualifications, the applicable standard of care, how that standard was breached by the particular actions of the defendant, and how the breach caused the damages claimed by the plaintiff." *Gelman v. Cuellar*, 268 S.W.3d 123, 127 (Tex. App.–Corpus Christi 2008, pet. denied) (citing *Palacios*, 46 S.W.3d at 878-79). In

determining whether the report manifests a good faith effort to comply with the statutory definition of an expert report, we are limited to the four corners of the report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l); *Palacios*, 46 S.W.3d at 878. The report "need not marshal all the plaintiff's proof;" instead, it must (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 878-79.

## B. Halbridge is Qualified to Render a Standard-of-Care Opinion

Barrera contends that Halbridge is not qualified to render an opinion as to the standard of care applicable to Barrera, a family practitioner who practices obstetrics, because Halbridge is an obstetrician and not a family practitioner. Moreover, Barrera asserts that because Halbridge's report does not state "that the standard of care is the same for obstetricans and family practitioners [who surgically treat] pregnant patients," holding him to the same standard as an obstetrician "requires impermissible references beyond the four corners of the report." We disagree.

To be qualified to provide opinion testimony regarding whether a physician departed from the accepted standard of health care, an expert must satisfy section 74.401 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(A). Section 74.401 provides in pertinent part:

> (a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:
>
> > (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
> >
> > (2) has knowledge of accepted standards of medical care for the

4

> diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.
>
> . . . .
>
> (c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:
>
> > (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and
> >
> > (2) is actively practicing medicine in rendering medical care services relevant to the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a), (c).

"[A] proffered expert need not practice in the same speciality as the defendant physician to qualify as an expert for that case." *Carreras v. Trevino*, No. 13-08-00222-CV, 2009 WL 2596057, at *3 (Tex. App.–Corpus Christi Aug. 25, 2009, no pet.) (citing *Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003)). In determining whether the proffered expert is qualified, "the trial court's inquiry should not focus on the specialty of the physician defendant or the medical expert. Instead, . . . the trial court should determine whether the proffered expert has 'knowledge, skill, experience, training or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.* (quoting *Broders v. Heise*, 924 S.W.2d 148, 153-54 (Tex. 1996)) (internal citations omitted); *see also Sanjar v. Turner*, 252 S.W.3d 460, 464-65 (Tex. App.–Houston [14th Dist.] 2008, no pet.) (holding that the "accepted standards of medical care" language in section 74.401(a)(2) relates to the condition at issue and not to

5

the defendant physician's specialty).

Barrera's arguments challenging Halbridge's qualifications fail for two reasons. First, the determination to perform a cesarean section,[1] the performance of the cesarean section, and the post-delivery care of Esmeralda, were the specific issues before the trial court. *See Carreras*, 2009 WL 2596057 at *3-4. Implicit in Barrera's assertion that Habridge's report does not state "that the standard of care is the same for obstetricans and family practitioners [who surgically treat] pregnant patients" is the presumption that a different—or, perhaps, more precisely, a lower—standard of care applies to family practitioners than to obstetricans. Barrera does not cite to authority supporting his implicit presumption, and we find none.

Second, the record clearly demonstrates Halbridge's qualification to opine on the specific issues before the trial court. Halbridge received his medical degree from the University of Nebraska College of Medicine, completed his residency at the Brookdale Hospital Medical Center in Brooklyn, New York, and earned board certification in obstetrics and gynecology in 1978. Since 1981, he has practiced obstetrics and gynecology. Halbridge's report provides:

I am familiar with the standard of care for:

1. The clinical diagnosis of cephalopelvic disproportion.

2. The clinical, prenatal evaluation of the maternal pelvis.

3. The indications for performing a Caesarean [sic] section.

4. The evaluation and treatment of a severely anemic post-Caesarian [sic] section patient.

---

[1] A cesarean section is a surgical procedure in which an incision is made "through the abdominal and uterine walls for extraction of the fetus." IDA G. DOX ET AL., ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY S:15 (West 1997).

The report then states that Barrera breached the standard of care required in conducting the aforementioned obstetric/gynecologic procedures by failing to (1) recognize that Esmeralda did not require a cesarean section, (2) determine and document Esmeralda's pelvic capacity, and (3) evaluate and treat Esmeralda's post-delivery symptoms of anemia. We conclude that because Halbridge's knowledge, education, training and experience qualifies him as an expert on issues of obstetrics and gynecology, he was qualified to opine as to the standard of care applicable to Barrera. *See Sanjar*, 252 S.W.3d at 464-65. Accordingly, the trial court did not abuse its discretion in denying Barrera's motion to dismiss on the grounds that Halbridge was not qualified to render an expert opinion.

## C.    Causation

Barrera also contends that Halbridge's expert report "offers only a conclusory stab at causation" by "fail[ing] to establish the required causal link between [Barrera]'s alleged breaches of the standard of care and Plaintiff's injuries." Halbridge's supplemental expert report reads in pertinent part:

> The following are the departures from the standard by Dr. Barrera during his treatment of Esmeralda Sarmiento:
>
> 1.    The failure of Dr. Barrera to administer a prophylactic antibiotic at the time of the Caesarean [sic] section on 10/5/07.
>
> The standard of care requires the administration of a prophylactic antibiotic at the time of Caesarean [sic] section. . . .
>
> The Anesthesia Record as well as the Intraoperative Nursing Record demonstrates that no antibiotic was administrated to the patient during the Caesarean [sic] section. . . .
>
> The failure of Dr. Barrera to administer the prophylactic antibiotic at the time of the Caesarean [sic] section directly resulted in:

a) The elimination of the benefit of prophylaxsis.

b) Infection at the placental site resulting in its subinvolution th[at] directly led to chronic blood loss, severe anemia, hypovolemic shock, and death.

c) Abscess formation it [sic] the abdominal wall caused by Group B Streptococci and Staph aureus organisms. . . .

2.      The failure of Dr. Barrera to recognize that the risk of infection and its complications are for [sic] greater after a Caesarean [sic] section than following a vaginal delivery.

The failure of Dr. Barrera to recognize that the risk of uterine infection after Caesarean [sic] section was between 5-38 times higher than for a vaginal delivery directly led to his decision to perform the unnecessary Caesarean [sic] section on Esmeralda Sarmiento that resulted in:

a) The failure to provide antiobiotic prophylaxsis.

b) Infection in the placental site that caused subinvolution of the placental site with chronic, excessive blood loss.

c) Severe anemia

d) Hypovolemic shock and death. . . .

3.      The failure of Dr. Barrera to recognize during the postoperative office visit on 10/12/07 that Esmeralda Sarmiento suffered with:

a) Severe anemia

b) Hypovolemia

c) Low blood pressure

d) Abdominal wall abscess

e) Excessive vaginal bleeding

The standard of [c]are requires that a physician carefully examine and evaluate a patient who has had a Caesarean [sic] section seven days earlier.

8

The items that are to [sic] evaluated include:

a) A comparison of the patient's preoperative and postoperative blood pressure.

b) Questioning the patient regarding the number of perineal pads she has used per day to absorb the vaginal bleeding.

c) Is she experiencing clotting with the vaginal bleeding?

d) Obtaining a CBC complete blood count[.]

e) Examination of the abdominal wall including palpation to determine if the wound is infected, if an abscess is present, and to see if the wound is indurated or inflamed.

Dr. Barrera failed on 10/12/07 in the following ways:

a) The blood pressure during the office visit on 10/12/07 was 110/60. The blood pressure during the last prenatal visit was 132/72; the blood pressure on 10/5/07 the day of surgery was 132/78. . . . [Dr. Barrera] should have recognized that the lowered blood pressure was likely due to lowered blood volume.

b) During the office visit on 10/12/07, Dr. Barrera should have asked the patient regarding how many pads she was using per day to absorb the vaginal flow of blood. Asking the above question would have told Dr. Barrera that the patient who was known to be anemic on 10/6/07, was experiencing an abnormally heavy blood flow.

An abnormally heavy blood flow following a Caesarean [sic] section is due to uterine infection or retained products of conception. Dr. Barrera would have then been required to be [sic] hospitalize the patient, culture for infection, treat with antibiotics, and tranfuse with blood products. The failure of Dr. Barrera to do all of the above items was the direct and proximate cause of Esmeralda Sarmiento's avoidable death.

c) After the CBC on 10/12/07 was drawn, Dr. Barrera made no attempt to obtain the results on the same day. If had had [sic] called the laboratory he would have learned that the patient's hematocrit had dropped to 20%. Armed with this knowledge, he would have been required to hospitalize the patient, culture the uterus, and check for retained products of conception, treat with antibiotics, and transfuse with blood products. The failure of Dr. Barrera to do all of the above items was the direct and proximate cause of Esmeralda Sarmiento's avoidable death.

d) On 10/12/07 Dr. Barrera did not perform an adequate examination of the Caesarean [sic] section wound and the adjacent abdominal wall.  If the wound & the abdominal was [sic] had been palpated Dr. Barrera would have recognized . . . the inflamation, induration, and the underlying abscess at the incision site.

The failure of Dr. Barrera to palpate the incision site on 10/12/07 directly resulted in this failure of [sic] recognize the abscess cavity and adjacent abdominal wall infection.

If Dr. Barrera had palpated the abdominal wall incision on 10/12/07 and recognized the abscess and adjacent infection, he could have admitted the patient to the hospital where her severe amenia would have bee[n] discovered by performing a CBC.  Furthermore, she would have been treated with an antibiotic therapy and transfused with blood products.  Thusly, her life would have been saved.

In summary[,] the departures from the standard of care by Dr. Barrera were the direct and proximate cause of the avoidable death suffered by Esmeralda Sarmiento.

We conclude that Halbridge's report establishes the causal links between the alleged negligence and Esmeralda's injuries.  Halbridge's report states that Barrera breached the standard of care by failing to recognize the increased risk of infections and complications associated with a cesarean section which lead to an unnecessary cesarean section.  Halbridge then states that Barrera breached the standard of care by failing to administer a prophylactic antibiotic at the time of the cesarean section and that this breach caused "[i]nfection at the placental site resulting in its subinvolution th[at] directly led to chronic blood loss, severe anemia, hypovolemic shock, and death."

Halbridge's report also sets out the standard of care required in a post-delivery evaluation by detailing "items" that must be evaluated.  Halbridge states that Barrera failed to meet the standard of care required in a post-delivery evaluation by failing to:  (1) recognize the significance of Esmeralda's low blood pressure; (2) ask pertinent questions to determine whether Esmeralda was experiencing heavy vaginal blood flow; (3) obtain the results of Esmeralda's CBC; and (4) adequately examine the cesarean section wound and

10

abdomen wall. According to Halbridge's report, Barrera's breaches resulted in a failure to administer appropriate treatment and caused Esmeralda's death.

In light of the foregoing, we cannot conclude that the trial court abused its discretion in denying Barrera's motion to dismiss. Sarmiento's expert report adequately sets forth the applicable standard of care, identifies how Barrera breached the standard of care, and explains how the breach caused the injuries claimed by Sarmiento. *See Palacios*, 46 S.W.3d at 878. The report put Barrera on notice of the specific conduct complained of and provided the trial court a basis on which to determine the claims have merit. *See id.* Barrera's sole issue is overruled.[2]

### III. CONCLUSION

Having overruled Barrera's sole issue, we affirm the trial court's order denying his motion to dismiss.



ROGELIO VALDEZ
Chief Justice

Delivered and filed
the 24th day of November, 2009.

---

[2] Having determined that the trial court did not abuse its discretion in denying Barrera's motion to dismiss Sarmiento's claims, we need not address Barrera's argument regarding attorney's fees. *See* TEX. R. APP. P. 47.1.