COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





RONALD F. BAKER, M.D.,


 Appellant,


v.


CHRISTINA GOMEZ, Individually and as
Personal Representative of the Estate of
LORENZO GOMEZ, and all Wrongful
Death Beneficiaries, and as Next Friend of
SAVANNAH NICHOLE GOMEZ,
BREANN TYARA GOMEZ,


 Appellee. 

§


 


§


 


§


 


§


 


§



§


 §


 §





No. 08-06-00330-CV



Appeal from


 327th District Court


of El Paso County, Texas


(TC # 2005-7707)




O P I N I O N



 Dr. Ronald F. Baker appeals the denial of his motions to dismiss pursuant to Section 74.351
of the Texas Medical Liability and Insurance Improvement Act. For the following reasons, we
reverse and remand.

FACTUAL SUMMARY


 On November 7, 2003, 38-year-old Lorenzo Gomez was conducting law enforcement tactical
exercises when he felt dizzy, developed a headache, and became nauseous. He was taken by
ambulance to the emergency room of Sierra Medical Center at 2:20 p.m. where he was
initially examined and treated by Dr. Sergio Ibarra. At 5:53 p.m., Dr. Baker--the hospital physician
on call--admitted Gomez to a general medical ward. Admission orders included "IV NS at 125
cc/hour, phenergen q6 hours prn and antivert 25mg q8 hours prn." While on the ward that evening,
Dr. Baker issued telephone orders for 25 mg of demerol and 25 mg of phenergen. These instructions
were given at 10:40 p.m. The nursing staff checked Gomez at 11 p.m. and 2:30 a.m and found his
vital signs normal. Gomez was not evaluated by a physician until 6:35 a.m. on November 8. At that
time, a nurse found him unresponsive and not breathing. A "Code Blue" was called but resuscitation
efforts were unsuccessful and Gomez was pronounced dead. An autopsy revealed that the cause of
death was rhabdomyolysis causing acute tubular necrosis. (1) Dr. Baker did not see Gomez prior to his
death.

 This suit was filed on October 31, 2005 by Christina Gomez, individually and as the personal
representative of the Estate of Lorenzo Gomez and all wrongful death beneficiaries, and as next of
friend of Savannah Nichole Gomez and Breann Tyara Gomez. Tenet Hospitals, Ltd., a Texas
Limited Partnership d/b/a Sierra Medical Center, Dr. Sergio Ibarra, and Dr. Baker were all named
as defendants. The plaintiffs filed expert reports and the curriculum vitae of Barton W. Butterbaugh,
M.D., Lennie Medina, R.N., and James Bradley, M.D. On March 2, 2006, Dr. Baker filed a motion
challenging the adequacy of Butterbaugh's and Medina's reports and sought dismissal pursuant to
Section 74.351(b). On March 9, Dr. Baker sought similar relief with regard to Dr. Bradley's report. 
The trial court denied Dr. Baker's challenges to the adequacy of the expert reports and denied
the motions to dismiss.  Consequently, she did not consider the plaintiffs' alternative request for a
30-day extension to cure any deficiencies found.

HEALTH CARE LIABILITY CLAIM


 In a health care liability claim, a claimant shall, not later than the 120th day after the date the
claim was filed, serve on each party or the party's attorney one or more expert reports, with a
curriculum vitae of each expert listed in the report for each physician or health care provider against
whom a liability is asserted. Tex.Civ.Prac.&Rem.Code Ann. § 74.351 (a)(Vernon 2005). (2) An
expert report is defined as a written report by an expert that provides a fair summary of the expert's
opinions as of the date of the report regarding applicable standards of care, the manner in which the
care rendered by the physician or health care provider failed to meet those standards, and the causal
relationship between that failure and the injury, harm, or damages claimed. Tex.Civ.Prac.&Rem.
Code Ann. § 74.351 (r)(6)(Vernon Supp. 2007). 

 There are two ways an expert report may be untimely served under Section 74.351: (1) the
expert report was not served within 120 days after the date the claim was filed, or (2) although the
report was timely served, it was deficient. See Tex.Civ.Prac.&Rem.Code Ann. § 74.351 (a),(b)
& (c). If an expert report has not been served within the period specified by subsection (a), the court,
upon motion by the affected physician shall, subject to subsection (c), enter an order that:

 (1) awards to the affected physician or health care provider reasonable attorney's fees
and costs of court incurred by the physician or health care provider; and


 (2) dismisses the claim with respect to the physician or health care provider, with
prejudice to the refiling of the claim.


See Tex.Civ.Prac.&Rem.Code Ann. § 74.351 (b). If an expert report has not been timely served
because elements of the report are deficient, the court may grant one 30-day extension to the
claimant in order to cure the deficiency. Tex.Civ.Prac.&Rem.Code Ann. § 74.351 (c). 

 A defendant may via interlocutory appeal challenge a trial court's order that denies all or part
of the relief sought by motion under Section 74.351 (b), except that an appeal may not be taken from
an order granting an extension under Section 74.351 (c). Tex.Civ.Prac.&Rem.Code Ann. § 51.014
(a)(9)(Vernon Supp. 2007). Because an extension of time was not granted below, we have
interlocutory appellate jurisdiction. Id.

STANDARD OF REVIEW


 We review the denial of a motion to dismiss for an abuse of discretion. Murphy v. Mendoza,
234 S.W.3d 23 (Tex.App.--El Paso 2007, no pet.). A trial court abuses its discretion if it acts
without reference to any guiding rules or principles or acts in an arbitrary or unreasonable manner. 
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert. denied, 476 U.S.
1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). A trial court does not abuse its discretion merely
because a trial judge has decided a matter within her discretionary authority in a different manner
than we would. See id. at 242.

REPORT DEFICIENCIES?


Reports from Dr. Butterbaugh & Lennie Medina, R.N. 


 Dr. Baker first contends that the trial court erred in finding that the expert reports from 
Butterbaugh and Medina were adequate. We agree. Neither addresses the standard of care, breach,
and causation as to the actions of Dr. Baker. In response to Dr. Baker's motion to dismiss, the
plaintiffs averred it wasn't necessary for the trial court to decide if the reports were adequate because
"Dr. Butterbaugh's report was supplied as to Defendant Ibarra [and] Nurse Medina's report was
supplied as to Defendant Sierra Medical Center." Because the plaintiffs have conceded that neither
was intended to address Dr. Baker, the trial court erred in finding them adequate as to Dr. Baker. (3)

Dr. Bradley's Report


 In eight issues for review, Dr. Baker complains the trial court erred in denying his motion to
dismiss because Dr. Bradley's report fails to comply with the requirements of Section 74.351. Our
analysis of these issues requires that we consider (1) whether Bradley is qualified to render an
opinion as to the standard of care for the treatment of rhabdomyolysis; (2) whether his report states
the applicable standard of care; (3) whether the report properly addresses all acts of negligence pled;
and (4) whether causation is adequately addressed. 

Qualifications


 Dr. Baker contends that Bradley's report doesn't show that he has knowledge of the accepted
standard of care, that he is actively practicing medicine relevant to the claim, or that he is board
certified in an area relevant to the claim. A person may qualify as an expert witness on the issue of
whether the physician departed from accepted standards of medical care only if the person is a
physician who: 

 (1) is practicing medicine at the time such testimony is given or was practicing
medicine at the time the claim arose;


 (2) has knowledge of accepted standards of medical care for the diagnosis, care, or
treatment of the illness, injury, or condition involved in the claim; and 


 (3) is qualified on the basis of training or experience to offer an expert opinion
regarding those accepted standards of medical care.


Tex.Civ.Prac.&Rem.Code § 74.401 (a)(1-3); see also Tex.Civ.Prac.&Rem.Code Ann. § 74.351
(r)(5)(A)(with respect to a person giving opinion testimony regarding whether a physician departed
from acceptable standards of medical care, an "expert" means an expert qualified to testify under the
requirements of Section 74.401). In determining whether a witness is qualified on the basis of
training or experience, the court shall consider whether, at the time the claim arose or at the time the
testimony is given, the witness: 

 (1) is board certified or has other substantial training or experience in an area of
medical practice relevant to the claim; and 


 (2) is actively practicing medicine in rendering medical care services relevant to the
claim.


Tex.Civ.Prac.&Rem.Code Ann. § 74.401 (c). 

 We conclude that Bradley is qualified to render an opinion. He is board certified in internal
medicine, pulmonary medicine, and critical care medicine. He is licensed in both New Mexico and
Pennsylvania and is actively practicing medicine in Las Cruces, New Mexico. With regard to his
knowledge of the standard of care, Bradley stated:

 I have knowledge of the accepted standards of care for the diagnosis, care and
treatment of rhabdomyolysis and its sequelae both for patients admitted to the
hospital and those seen in the emergency department. Although I am not Board
Certified in Emergency Medicine, I have had extensive emergency department
experience to include numerous consultations, procedures and telephonic calls for
assistance in patient care. I am often times the admitting physician for such patients
and require specific tests, labs and x-rays to ensure proper disposition within the
hospital or the outpatient setting.


. . .



 To meet the standard of care for internists, and family practice physicians on call who
accept admission of a patient like Lorenzo Gomez to the general medicine floor, Dr.
Baker also needed to exclude the diagnosis of rhabdomyolysis. To do so he needed
to evaluate the patient, and repeat the serum CPK, or order it initially if the ER
physician had not done so. He also needed to review the rate of hydration and order
it increased if the rate was initially inadequate. 


Bradley's knowledge of the standard of care is based upon his extensive emergency department
experience as well as his experience as the admitting physician for such patients within the hospital
or outpatient setting. Although he is not board certified in emergency medicine, his report details
his experience dealing with patients with rhabdomyolysis. The trial court did not abuse its discretion
in finding Dr. Bradley qualified to render an opinion. See Tex.Civ.Prac.&Rem.Code § 74.401
(a)(1-3). 

Standard of Care


 Dr. Baker next argues that Bradley's report fails to state the applicable standard of care for
an admitting physician regarding the acceptable time frame for patient evaluation.  He frames the
issue thusly: "Bradley does not indicate that Baker breached the standard of care by not seeing
Gomez immediately following admission. Nor does Bradley state what the standard protocol is for
the follow up by an admissions doctor when a patient has been evaluated and treated in the
emergency room." 

 An expert report must provide a fair summary of the expert's opinions regarding the
applicable standard of care. See Section 74.351(a). "While a 'fair summary' is something less than
a full statement of the applicable standard of care and how it was breached, even a fair summary
must set out what care was expected, but not given." American Transitional Care Centers of Texas,
Inc. v. Palacios, 46 S.W.3d 873, 880 (Tex. 2001), citing Palacios v. American Transitional Care
Centers of Texas, Inc., 4 S.W.3d 857, 865 (Tex.App.--Houston [1st Dist.] 1999)(Taft, J. dissenting). 

 Dr. Bradley's report states:

 To meet the standard of care for internists, and family practice physicians on call who
accept admission of a patient like Lorenzo Gomez to the general medicine floor,
Dr. Baker also needed to exclude the diagnosis of rhabdomyolysis. To do so he
needed to evaluate the patient, and repeat the serum CPK, or order it initially if the
ER physician had not done so. He also needed to review the rate of hydration and
order it increased if the rate was initially inadequate. [Emphasis added].


We find one serious flaw. While the report provides specific information as to what care was
expected but not given, it wholly fails to address the applicable time frame. Palacios, 46 S.W.3d
at 880. And that omission is critical in the evaluation of an admitting doctor's performance. When
did Dr. Baker need to evaluate Gomez? At the time of admission? When he issued additional
orders? At some point in between? To that extent, the report is deficient.

Breach


 Dr. Baker next contends that Bradley fails to address each of the acts of negligence alleged
in the petition. The plaintiffs alleged Dr. Baker was negligent by one or more of the following: 

 (1) Failed to properly treat Lorenzo Gomez during his admission;


 (2) Failed to timely diagnose and treat rhabdomyolysis;


 (3) Failed to order appropriate tests for diagnosing rhabdomyolysis;


 (4) Failed to timely see, evaluate and treat the patient in the hospital;


 (5) Failed to order rehydration at an appropriate rate;


 (6) Failed to obtain appropriate consults; and


 (7) Failed to prevent, through medical treatment, the development of acute tubular
necrosis and fatal cardiac arrhythmia. 


To avoid dismissal, the plaintiffs need not present evidence as if they were litigating the merits. 
Palacios, 46 S.W.3d at 879. An expert report can be informal and need not meet the same
requirements as evidence offered in a summary judgment proceeding or at trial. Id. Instead, the
report must inform the defendant of the specific conduct the plaintiff has called into question and
the report must provide a basis for the trial court to conclude the claims have merit. Id. 

 Dr. Baker claims that Bradley's report fails to support allegations (4), (6), and (7). (4) We have
already determined that Bradley's report is deficient with regard to allegation (4). Concerning
allegation (6), the report states:

 Dr. Ronald Baker was consulted and accepted admission to a general medicine ward
at 1753 hours. Admission orders were for IV NS at 125 cc/hour, phenergen q6 hours
prn and antivert 25 mg q8 hours prn. Patient was given fall precautions and an order
was written to call for problems. No physician evaluated the patient until the next
morning 11/08/03 at 0635 hours.


 While on the general medicine ward Dr. Baker made a telephonic order 11/07/03 at
2240 hours for demerol 25 mg and pherergen 25 mg was given to the nursing staff. 
Mr. Gomez was checked by the nursing staff 11/07/03 at 2300 hours, 11/08/03 at
0230 hours (vital signs were normal on both occasions). 

 

. . .



 To meet the standard of care for internists, and family practice physicians on call who
accept admission of a patient like Lorenzo Gomez to the general medicine floor, Dr.
Baker also needed to exclude the diagnosis of rhabdomyolysis. To do so he needed
to evaluate the patient, and repeat the serum CPK, or order it initially if the ER
physician had not done so. He also needed to review the rate of hydration and order
it increased if the rate was initially inadequate. 


 The standard of care was not met in this case. On presentation to the Emergency
Department at Sierra Providence the diagnosis of rhabdomyolysis was not considered
by Dr. Ibarra. He did not order a myoglobin and serum CPK level. The patient was
given a sub-standard IV NS rate of 125 cc/hour and admitted to a general medicine
ward. Admission orders were written at 1745 hours and the patient was not seen by
the accepting physician, Dr. Baker, prior to his death on 11/08/03 at 0645 hours. 
Repeat laboratory values were not obtained except during the [']Code Blue'. A K
value of 11.6 was notable.


All that is required is a "fair summary" as to the required elements of the expert report. Palacios,
46 S.W.3d at 878. Here, although not clearly expressed, Dr. Bradley's report does provide support
for the allegation that Dr. Baker failed to obtain necessary consultations. Gomez was not evaluated
by a physician following his admission to the hospital. To meet the standard of care, Dr. Baker
should have evaluated the patient and repeated the serum CPK if the ER physician had not done so.
Dr. Ibarra did not order a myoglobin and serum CPK level, and repeat labs were not obtained except
during the "Code Blue." The report informs Dr. Baker that he should have ordered the serum CPK
since Dr. Ibarra did not order them.

 Bradley also addressed allegation (7)--Dr. Baker failed to prevent the development of acute
tubular necrosis and fatal cardiac arrhythmia. Based on the autopsy report, the cause of death was
ruled as rhabdomyolysis causing acute tubular necrosis. Bradley opines:

 Prevention of acute renal failure is the preeminant concern for all patients presenting
with rhabdomyolysis. Early aggressive volume repletion is essential, rates of NS
300-500 cc/hour are normal. Bicarbonate is usually administered to alkalinize the
urine to prevent precipitation of CPK in the renal tubes. Rhabdomyolysis may cause
hyperkalemia, hyperphosphaternia, hypocalcernia, hyperuricernia and DIC. Morbitity
is most directly with incomplete management of associated metabolic pretubations
(i.e..hyperkalemia).




. . .



 The standard of care was not met in this case. On presentation to the Emergency
Department at Sierra Providence the diagnosis of rhabdomyolysis was not considered
by Dr. Ibarra. He did not order a myoglobin and serum CPK level. The patient was
given a sub-standard IV NS rate of 125 cc/hour and admitted to a general medicine
ward. Admission orders were written at 1745 hours and the patient was not seen by
the accepting physician, Dr. Baker, prior to his death on 11/08/03 at 0645 hours. 
Repeat laboratory values were not obtained except during the [']Code Blue'. A K
value of 11.6 was notable.


. . .



 Mr. Gomez developed acute renal failure secondary to rhabdomyolysis which
resulted in hyperkalemia that resulted in a life-threatening ventricular dysarrythmia
resulting in his death. The hyperkalemia resulted from the kidneys inability to
excrete excess potassium. Hyperkalemia, in turn, is well known to trigger cardiac
dysarrythmias. The initial asystolic rhythm during the 'Code Blue' and the autopsy
findings correlate with these findings. 

 

We conclude that the report sufficiently supports allegations (6) and (7).

Causation


 Finally, Dr. Baker argues Bradley's report is conclusory and his statements are impermissibly
commingled with the allegations against multiple defendants. He suggests the report is deficient
since it does not explain whether his intervention at the time he first became involved could have
prevented the patient's death or whether the breaches by Dr. Ibarra would have caused the injury
irrespective of any action or inaction from Dr. Baker. We disagree with the first assertion, but agree
with the second.

 Causation is established if an expert report provides enough information linking the
defendant's purported breach of the standard of care to the plaintiff's injury. See Hutchinson v.
Montemayor, M.D., 144 S.W.3d 614, 617 (Tex.App.--San Antonio 2004, no pet.); see also Bowie
Memorial Hosp. v. Wright, 79 S.W.3d 48, 53 (Tex. 2002). An expert report may not assert that
multiple defendants are all negligent for failing to meet the standard of care without providing an
explanation of how each defendant specifically breached the standard and how that breach caused
or contributed to the cause of injury. Taylor v. Christus Spohn Health Syst. Corp., 169 S.W.3d 241,
244-46 (Tex.App.--Corpus Christi 2004, no pet.). An expert must explain the basis of his statements
to link his conclusions to the facts. Wright, 79 S.W.3d at 52.

 We have reviewed the four corners of the report and find it is not conclusory. See Palacios,
46 S.W.3d at 878 (to determine whether an expert report provides a fair summary regarding the
required elements, the only information relevant to the inquiry is within the four corners of the
document). The report discusses both Dr. Ibarra and Dr. Baker's actions, as well as the causal
relationship between each doctor's actions and the patient's death:

 On presentation to the Emergency Department at Sierra Providence the diagnosis of
rhabdomyolysis was not considered by Dr. Ibarra. He did not order a myoglobin and
serum CPK level. The patient was given a sub-standard IV NS rate of 125 cc/hour
and admitted to a general medicine ward. Admission orders were written at 1745
hours and the patient was not seen by the accepting physician, Dr. Baker, prior to his
death on 11/08/03 at 0645 hours. Repeat laboratory values were not obtained except
during the [']Code Blue'. A K value of 11.6 was notable. 


 The substandard care provided by Dr. Ibarra in the Emergency Department, and by
Dr. Baker in the general medicine ward, deprived Mr. Gomez of a reasonable chance
of probable recovery. With adequate hydration to flush the kidneys, survival of
rhabdomyolysis is practically assured. Mr. Gomez developed acute renal failure
secondary to rhabdomyolysis which resulted in hyperkalemia that resulted in a life-threatening ventricular dysarrythmia resulting in his death. The hyperkalemia
resulted from the kidneys inability to excrete excess potassium. Hyperkalemia, in
turn, is well known to trigger cardiac dysarrythmias. The initial asystolic rhythm
during the 'Code Blue' and the autopsy findings correlate with these findings. My
opinions are based upon reasonable medical probability. 


 According to Bradley, the preeminent concern for all patients presenting with rhabdomyolysis
is the prevention of acute renal failure and an early aggressive volume of normal rates of NS 300-500
cc/hour is essential. At admission, Dr. Baker ordered substandard hydration. Gomez was not seen
by Dr. Baker prior to his death, and repeat laboratory values were not obtained. Gomez "developed
acute renal failure secondary to rhabdomyolysis which resulted in hyperkalemia that resulted in a
life-threatening ventricular dysarrythmia resulting in his death." Based upon reasonable medical
probability, Bradley opines that Dr. Baker's substandard care deprived Gomez of a reasonable
chance of probable recovery since "[w]ith adequate hydration to flush the kidneys, survival of
rhabdomyolysis is practically assured."

 But we also believe Bradley's opinions on causation suffer from the same flaw--the report
purports to explain how Dr. Baker breached the standard of care and how his breach caused or
contributed to the Lorenzo's death without identifying the point at which Dr. Baker should have
intervened. Without that information, one cannot glean whether Dr. Baker's intervention could have
prevented the patient's death.

CONCLUSION


 We overrule Issues III, VI, and VII. We sustain Issues I and II in their entirety. We sustain
Issues IV, V and VIII in part. Having found Dr. Bradley's report insufficient to address the standard
of care of an admitting physician and the purported breaches and causation nexus evolving
therefrom, we reverse and remand for consideration of a thirty day extension to cure the deficiencies. 
See Murphy v. Mendoza, 234 S.W.3d at 30.



January 24, 2008 

 ANN CRAWFORD McCLURE, Justice


Before McClure, Ables, JJ., and Barajas, C.J. (Ret.)

Ables, J., sitting by assignment

Barajas, C.J. (Ret.), sitting by assignment


1. Rhabdomyolysis is "a clinical and laboratory syndrome resulting in skeletal muscle injury with release of cell
contents into the plasma." 
2. The lawsuit was filed before the effective date of the 2005 amendment to Section 74.351(a). See
Tex.Civ.Prac.&Rem.Code Ann. § 74.351 (a)(Vernon Supp. 2007). 
3. Because these reports did not relate to Dr. Baker, we need not address the issue of whether we should remand
to the trial court for consideration of a thirty day extension to cure the deficiencies. 
4. Dr. Baker also alleges the report failed to address the second allegation. This complaint is not preserved for
review since it was not raised in the motion to dismiss nor was it mentioned at the hearing. In his reply brief, Dr. Baker
contends he raised the issue when counsel argued, "There is nothing in this report that says there is a standard of care
that for a person who is being admitted to the regular floor of the hospital or to a telemetry floor or critical care floor or
any other floor, what time they must see that patient by." Prior to making this statement however, counsel stated,
"Element 4 was that Dr. Baker's failure to timely see, evaluate and treat the patient in the hospital." Counsel specifically
addressed only allegations (4), (6), and (7). See Tex.R.App.P. 33.1.