

**NUMBER 13-06-413-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **HAROON ISMAIL PATEL, M.D., ET AL.,** | **Appellants,** |
| **v.** | |
| **TRENA RODRIGUEZ, INDIVIDUALLY AND AS REPRESENTATIVE FOR THE ESTATE OF CORINA RENEE GUTIERREZ, DECEASED,** | **Appellee.** |

**On appeal from the 214th District Court of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Justice Yañez**

In this interlocutory appeal, appellants, Haroon Ismail Patel, M.D., Paul E. Stobie, M.D., and SheilaYvonne Owens-Collins, M.D., appeal the denial of their motion to dismiss a medical negligence lawsuit filed by appellee, Trena Rodriguez, individually and as

representative for the estate of Corina Renee Gutierrez, deceased.[1] By various issues and sub-issues, appellants contend the trial court abused its discretion in denying their motion to dismiss the suit. We affirm.

## I. Background

Appellee's daughter, Corina Renee Gutierrez, was born on November 25, 2003. A few hours later, Corina was transferred to Driscoll Children's Hospital for surgery to repair her gastroschisis, a congenital defect which allowed loops of her bowels to protrude through an opening in her abdominal wall. Dr. Patel, a pediatric surgeon successfully performed the surgery around midnight on November 25. Dr. Patel placed a central venous catheter ("CVC") for administering medication and nourishment to Corina post-operatively.

Dr. Stobie, a neonatologist, was the admitting physician; he monitored and treated Corina for the short time she was in the Neonatal Intensive Care Unit (NICU). Dr. Owens-Collins, a neonatologist, also monitored and treated Corina. Over the next ten hours, Corina's condition deteriorated; she went into cardiorespiratory arrest and died at approximately 10:30 p.m. on November 26, 2003.

Appellee alleges that Dr. Patel improperly placed the CVC line, which was used post-operatively to feed Corina total parenteral nutrition fluid (TPN). According to appellee, the malpositioned central line caused fluid to leak into the pleural cavity surrounding Corina's lungs, which caused her to die by "literally drown[ing] in TPN fluid." Appellee also alleges that Drs. Stobie and Owens-Collins negligently failed to adequately monitor Corina

---

[1] Appellee alleges that the death of her one-day-old daughter, Corina Renee Gutierrez, was caused by the medical treatment she received—or failed to receive—from appellants.

2

for complications arising from the misplaced catheter, and as a result, failed to timely address her pleural effusion complications.

Appellee filed suit against appellants on January 23, 2006; she also filed two expert reports—one from William Rhine, M.D., a pediatrician and neonatologist, and a second report from Steven A. Sahn, M.D., a pulmonologist and specialist in pleural effusions. Each appellant filed a motion to dismiss, contending that the expert reports do not constitute a good-faith effort to comply with the expert-report requirements.[2] Following a hearing on June 27, 2006, the trial court denied appellants' motions to dismiss.

## II. Jurisdiction

We begin by addressing our jurisdiction over this interlocutory appeal. Appellee raises the issue of jurisdiction, noting that section 54.014 of the civil practice and remedies code authorizes an appeal only from (1) an order that denies relief sought under section 74.351(b) and (2) an order that grants relief sought under section 74.351(l).[3] Since appellee filed her briefs, the supreme court has held that a challenge to the sufficiency of an expert report is a challenge pursuant to section 74.351(b) that no compliant report has been served.[4] Therefore, we have jurisdiction to consider appellant's interlocutory appeal.[5]

## III. Standard of Review and Applicable Law

We review the trial court's decision to deny a motion to dismiss under an abuse of

---

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (l), (r)(5)-(6) (Vernon Supp. 2008).

[3] *See id.* § 51.014(a)(9), (10) (Vernon 2008).

[4] *See Lewis v. Funderburk*, 253 S.W.3d 204, 207-08 (Tex. 2008); *see also Gelman v. Cuellar*, No. 13-07-00651-CV, 2008 Tex. App. LEXIS 6173, at *5 (Tex. App.–Corpus Christi August 14, 2008, no pet. h.).

[5] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9).

3

discretion standard.[6]  The trial court is limited to reviewing the information within the four corners of the report.[7]  "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles."[8]  An appellate court may not reverse for abuse of discretion simply because it would have decided the matter differently.[9]

"With respect to resolution of factual issues or matters committed to the trial court's discretion, for example, the reviewing court may not substitute its judgment for that of the trial court."[10]  The appellant must "establish that the trial court could reasonably have reached only one decision."[11]  Conversely, a trial court has no discretion in determining what the law is or in applying the law to the facts.[12] "[A] clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion."[13]

Section 74.351 requires that a plaintiff serve on each party "one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or

---

[6] *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877-78 (Tex. 2001); *see Gelman*, 2008 Tex. App. LEXIS 6173, at *6.

[7] *Palacios,* 46 S.W.3d at 878.

[8] *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Moore v. Sutherland*, 107 S.W.3d 786, 789 (Tex. App.–Texarkana 2003, pet. denied) (citing *Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex. 1999)).

[9] *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex.1985).

[10] *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992).

[11] *Id.* at 840.

[12] *Id.*

[13] *Id.*

4

health care provider against whom a liability claim is asserted."[14]  An "expert report" is defined as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.[15]

A court must grant a motion to dismiss under section 74.351(b) if, after the 120-day deadline has passed, it appears to the court that the report does not represent an objective, good-faith effort to comply with the definition of an expert report.[16]

To qualify as a "good-faith effort," the report must "provide enough information to fulfill two purposes":  (1) it must "inform the defendant of the specific conduct the plaintiff has called into question," and (2) it must "provide a basis for the trial court to conclude that the claims have merit."[17]  "A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes.  Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements."[18]

### IV.  Sufficiency of Expert Reports

### A.  Dr. Patel

In a single issue, Dr. Patel contends that the trial court abused its discretion in

---

[14] TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).

[15] *Id.*  § 74.351(r)(6).

[16] *Id.* § 74.351(l).

[17] *Palacios*, 46 S.W.3d at 879.

[18] *Id.*

5

denying his motion to dismiss because both expert reports failed to satisfy the statutory requirements for an "expert report."[19]  Specifically, Dr. Patel argues that Dr. Rhine's report is conclusory because it fails to set forth the standard of care, breach of the standard of care, and proximate cause with respect to him.  He also argues that Dr. Sahn's report is conclusory because it fails to set forth how Dr. Patel breached the standard of care and how that alleged breach proximately caused Corina's death.

### 1. Dr. Sahn's Report

Dr. Patel argues that Dr. Sahn's report is inadequate because it fails to state how he breached the standard of care and how the alleged breach proximately caused Corina's death.  In two single-spaced pages, Dr. Sahn's report details the standard of care for insertion of a CVC.[20]  The report states, in pertinent part:

> Summary [of medical facts]:  This was a one-day old infant, who had a central line placed at about 1100 on 11/26/03 by Dr. Patel.  The infant was under the care of Drs. Stobie and Collins.[21]  The nurses' notes indicate that the infant was reported to Dr. Stobie as "pale" following the procedure, but no new orders were received.  ETT secretions were abnormal in color, but this was not acted upon.  The infant's labs were abnormal (TCOM documented increasing $PCO_2$ and ABG showed acute hypercapnic respiratory failure with minimal metabolic acidosis (pH 7.04, $PCO_2$ 77 and $PO_2$ 85)[)], and despite radiology reports of bilateral lung opacification that suggested pleural fluid at 1942, no action was taken.  The infant's respiratory arrest was predictable, given her pulmonary profile and her clinical status as tracked by laboratory findings.  The Code notations and Dr. Stobie's lengthy note document the devastating effect of the pleural effusions that resulted from the estravascular migration of the CVC.
>
> Dr. Stobie's notations are confirmed by the results of the autopsy report,

---

[19] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

[20] Because Dr. Patel does not contend that the report fails to adequately state the standard of care as to him, we do not quote that section of the report in its entirety.

[21] Dr. Sahn and Dr. Rhine refer to Dr. Owens-Collins as "Dr. Collins."

which established that Infant Corina Gutierrez had bilateral pleural effusions. The report by the medical examiner indicates that the pleural fluid from the left pleural space had a very high glucose concentration and was white, indicative of TPN fluid. The right pleural cavity had been drained with a chest tube during the code, with only 5mL of serosanguineous fluid remaining.

The post-mortem was normal, with the exception of the abdominal defect, the bilateral pleural effusions from TPN fluids, and the extensive soft tissue and mediastinal hemorrhage. As noted by the medical examiner, "the most significant finding in this case was the presence of large, bilateral milky pleural effusions with markedly elevated glucose and triglyceride concentrations, noted both premortem (right side) and postmortem (left side). There was no evidence of ischemic injury, in particular to the central nervous system. . . . In conclusion, this child appeared to have suffered a respiratory compromise leading to death secondary to large, bilateral pleural effusions consistent with total parenteral nutrition fluid."

It is clear from that stated above that this infant died as a result of her TPN fluid accumulating in her pleural space, effectively resulting in her respiratory failure, cardiac failure, and death. This is precisely the area of subspecialty medicine in which I have dedicated more than twenty-five years of research and publication.

Standard of care:

. . . .

Catheter malposition, a potentially devastating mechanical complication, is defined by observing the tip of the catheter in an inappropriate position. This complication can be detected in virtually 100% of cases if the post-procedure chest radiograph is carefully examined. When catheter malposition is diagnosed, it needs to be promptly corrected either by pulling the catheter back and re-suturing it or exchanging the catheter at the bedside over a guidewire. Catheter occlusion, venous thrombosis, venous embolism, venous perforation with hemothorax or infusion of intravenous solution into the mediastinum or pleural spaces or right atrial perforation with tamponade may occur if the catheter tip does not lie parallel within the lumen of the superior vena cava. . . .

Placement of a CVC requires that the standard of care be followed (supra vide). The operator should have sufficient experience to choose the correct site in a particular patient and understand potential risk factors for that patient. The operator should also be cognizant of the complications that can occur with the placement of CVCs. An immediate post-procedure chest

7

radiograph should be performed to document the position of the catheter tip. If the patient develops specific symptoms following insertion of a CVC, the operator should immediately perform the appropriate diagnostic studies to determine whether the patient's symptomatology is due to a complication of the catheter insertion or consequence of infusion of fluids. The attending physician whose patient had placement of the CVC should have similar knowledge so that they can respond appropriately to changes in the patient's status which may reflect complications of either the insertion or complications related to mechanical, infectious, or thrombolic/embolic complications.

If the standard of care is followed, the patient's clinical status, in addition to the laboratory reports, the nursing and respiratory therapy notes, and the imaging reports, should be meticulously observed and documented. If no abnormalities are noted, it is highly unlikely that the patient's respiratory status has not been [sic] compromised by the CVC. Prompt attention by the attending physician to any change in the respiratory status, including the patient's color, respiratory rate, ABG's, and imaging studies, should result in rapid assessment of the position and function of the CVC. If the standard of care was followed, the potential sequellae from the bilateral pleural effusions would have been minimized or prevented, with continued improvement toward eventual discharge in a recovered state of health.

Standard of care for Dr. Patel

A surgeon who places a central venous line catheter should:

1. Document the correct position of the CVC tip by chest imaging.

2. Consider the possibility of the complication of a failed initial catheter insertion.

3. Monitor the patient's respiratory status post-procedure.

4. Act promptly if the respiratory status worsens in the hours following CVC placement and fluid infusion.

Negligence of Dr. Patel: (inverse of above)

1. Dr. Patel failed to consider the possibility of the complication of a failed initial catheter insertion.

2. Dr. Patel failed to monitor the patient's respiratory status post-procedure.

3. Dr. Patel failed to act promptly if the respiratory status worsens in the hours following CVC placement and fluid infusion.

8

<u>Proximate Cause by Dr. Patel:</u>

It is my expert opinion that Dr. Patel's failure to follow the standard of care, as noted in the preceding sections, for the care required by a surgeon in the correct placement and monitoring of CVC were a proximate cause of Infant Corina Gutierrez's premature death as a direct result of her acute respiratory failure and subsequent cardiac failure caused by the bilateral pleural effusions that were a foreseeable consequence of extravascular migraton of the CVC.

The admission and autopsy notes indicate that the only abnormality that afflicted Infant Corina Gutierrez was gastroschisis and bowel atresia, which Dr. Patel repaired. Having completed the repair, the baby should have progressed through recovery to discharge home and her death was entirely preventable. However, the leakage of TPN fluid through a malpositioned central venous catheter into her pleural space, as a result of Dr. Patel's negligence, directly caused her respiratory and cardiac failure, and her premature death.

     . . . .

. . . However, Drs. Patel, Stobie and Collins did not properly evaluate, monitor, diagnose, nor mange [sic] the infant's increasingly deteriorating clinical status, with the result that her pleural effusions caused by leakage of TPN fluid into both pleural spaces progressed to cause acute hypercapnic and hypoxemic respiratory failure that resulted in her death. The pleural effusions were a foreseeable and detectable complication from extravascular migration of a CVC placed by Dr. Patel that could have been either avoided or timely managed, preventing her death. Although the infant was born with a congenital abdominal defect, this problem was addressed promptly, and the expected outcome is good for such patients. Therefore, it is my expert opinion that Infant Corina Renee Gutierrez would not have died, but for the negligence of Drs. Patel, Stobie and Collins to timely address her developing pleural effusions. This expert opinion is supported, not only by the results of the autopsy report indicating that her respiratory failure and cardiac insufficiency was a direct result of the pleural effusions from TPN fluid draining into her pleural cavities, but my opinion is also supported by the same finding noted by Dr. Stobie's last chart entry dated 11/26/03 at 2238.

According to Dr. Patel, the report contains "no explanation of what [he] did wrong or what he should have done differently." He complains that the report does not explain (1) how he failed to consider the possibility of a failed catheter insertion or why he should

9

have considered such a possibility, (2) what signs or symptoms he should have recognized as indicating a failed catheter insertion, or (3) how he failed to monitor Corina's respiratory status, what symptoms required such monitoring, and how he "failed to act promptly" if her respiratory status worsened. Dr. Patel also contends that the report is "conclusory regarding proximate cause" because it fails to explain how the "conclusory assertions" that he (1) failed to consider the possibility of a failed catheter insertion and (2) failed to monitor Corina's respiratory status caused her death. We disagree.

Dr. Patel argues that Dr. Sahn's report is similar to the reports found inadequate in *Longino v. Crosswhite*[22] and *Martinez v. Riegel*.[23] In *Longino*, the Texarkana Court of Appeals found that an expert report which stated only "that the delay in diagnosis [of bacterial meningitis] caused significant and permanent neurological injuries" was insufficient because it contained "mere conclusions concerning causation."[24] In *Martinez*, a report which explained only that "the anesthetic agents" irritated "the already inflamed lung tissue" failed to adequately explain the causal relationship between the defendants' performance of surgery and the injuries suffered by the patient.[25] We find these cases distinguishable from the present case.

As the supreme court has noted, "[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant

---

[22] *Longino v. Crosswhite*, 183 S.W.3d 913, 917-18 (Tex. App.–Texarkana 2006, no pet.).

[23] *Martinez v. Riegel*, No. 04-05-00336-CV, 2006 Tex. App. LEXIS 5655, at *11 (Tex. App.–San Antonio, no pet.) (mem. op.).

[24] *Longino*, 183 S.W.3d at 918.

[25] *Martinez*, 2006 Tex. App. LEXIS 5655, at *11.

should have done differently."[26]  A fair summary sets forth what care was expected, but was not given.[27]  Here, Dr. Sahn's report provides specific information about what Dr. Patel should have done differently.  It states that Dr. Patel failed to consider the possibility of a malpositioned cathether, failed to monitor Corina's respiratory status, and failed to act promptly if her respiratory status worsened (which it did).  The report also contains information about causation.  It states that Dr. Patel's failure to properly place and monitor the CVC proximately caused Corina's death "as a direct result of her acute respiratory failure and subsequent cardiac failure caused by the bilateral pleural effusions that were a foreseeable consequence of extravascular migration of the CVC."

We hold that Dr. Sahn's report constitutes a good-faith effort to comply with the requirements for an expert report.[28]  Accordingly, we need not address Dr. Patel's complaints regarding Dr. Rhine's report.[29]  We overrule Dr. Patel's issue.

### B.  Dr. Owens-Collins

In her first issue, Dr. Owens-Collins, a neonatologist, challenges the expert report filed by Dr. Sahn, a pulmonologist, on grounds that he lacks the qualifications to offer an expert opinion regarding the standard of care applicable to a neonatologist.  Thus, according to Dr. Owens-Collins, Dr. Sahn's report does not constitute a good-faith effort to comply with the expert report requirements as to standard-of-care issues.  In her second issue, Dr. Owens-Collins contends that neither expert report adequately addresses the

---

[26] *Palacios*, 46 S.W.3d at 880.

[27] *Id.*

[28] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Palacios*, 46 S.W.3d at 879.

[29] *See* TEX. R. APP. P. 47.1.

11

applicable standard of care and breach of the standard of care. Dr. Owens-Collins argues that both expert reports are conclusory because neither specifically describes "what care was expected, but not given."[30]

Appellee responds that (1) because of Dr. Sahn's expertise in the causation, diagnosis, and treatment of pleural effusions (the condition that caused Corina's death), he is qualified to offer an expert opinion regarding the standard of care; and (2) both expert reports provide sufficient information and specificity to meet the statutory requirements. We begin by examining the adequacy of Dr. Rhine's report.

## 1. Dr. Rhine's Report

Dr. Owens-Collins argues that Dr. Rhine's report fails to provide sufficient information and specificity to meet the requirements of chapter 74.[31] Dr. Owens-Collins also contends that Dr. Rhine's report is conclusory as to causation because it fails to link specific breaches of the standard of care to Corina's death.

The section of Dr. Rhine's report that specifically addresses Dr. Owens-Collins states, in pertinent part:

Standard of Care for Dr. Collins:

The assigned pediatric resident physician has a duty of diligent [sic] for the care of the patient. As such, the standard of care required that Dr. Collins:

1. Assess the infant upon admission and review the plan of care.

2. Document the treatment plan for the patient.

3. Evaluate the patient for the cause of any significant adverse change in her condition, such as her deterioration in the evening of 11/26/03, including

---

[30] *See Palacios*, 46 S.W.3d at 880.

[31] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (l), (r)(5)-(6).

12

interpreting the chest radiograph that reflected her pleural effusion.

4. Contact a supervising neonatologist, if and when she encounters a medical condition that she is unable to diagnose or treat, such as that suffered by Infant Corina Gutierrez on 11/26/03.

Negligence of Dr. Collins:

1. Dr. Collins failed to order a chest radiograph to be done sooner than 1942, which would have led to earlier diagnosis and treatment of the patient's pleural effusion, given the changes seen compared to the radiograph done at 1139.

2. Dr. Collins failed to diagnose the presence of a pleural effusion being associated with the patient's respiratory deterioration on the chest radiograph performed at 1942.

3. Dr. Collins failed to contact Dr. Stobie in a timely enough fashion to allow Dr. Stobie enough time to perform a needle aspiration of the patient's chest, which if done before her cardiorespiratory arrest, would have prevented its occurrence.

Proximate Cause by Dr. Collins:

It is my expert opinion that Dr. Collins' failures to follow the standard of care, as noted in the preceding sections, for the care required by a physician in the evaluation of a patient with a central line, were a proximate cause of Corina Gutierrez's premature death as a direct result of her respiratory and cardiac failure caused by the bilateral effusions that were a foreseeable potential consequence of the improper placement of her central line. Dr. Collins' delay in diagnosis and consultation with a more experienced physician led to the infant's overwhelming cardiorespiratory failure and death.

. . . .

. . . However, Drs. Stobie and Collins did not properly evaluate, monitor, diagnose, nor manage the infant patient's increasingly deteriorating clinical status, with the result that her pleural effusion from the leakage of intravenous fluid including nutritional support into her pleural cavity worsened to fill both sides, caused her respiratory failure, leading to cardiac insufficiency and her painful death, including a very invasive code sequence.

. . . .

13

The pleural effusions were a foreseeable and knowable complication from the placement of her central venous line by Dr. Patel, and could have been either avoided or managed in a timely fashion, preventing her death. Although the infant was born with a congenital abdominal defect, this problem was addressed promptly, and the expected outcome is very good for such patients. Therefore, it is my expert opinion that the infant, Corina Renee Gutierrez, would not have died during this neonatal hospitalization, but for the negligence of Drs. Stobie and Collins to timely address her developing pleural effusions that were evident in the infant's charting. This expert opinion is supported not only by the results of the autopsy report indicating that her respiratory failure and cardiac insufficiency was a direct result of the pleural effusions of nutritional fluid into her pleural cavity, but my opinion is also supported by the same finding noted by Dr. Stobie in the chart, in his last entries dated 11/26/03 at 2258 and 11/26/03 (actually 11/27/03) at 0023 and 0035.

Dr. Owens-Collins argues that "[a]lthough Dr. Rhine mentions 'interpreting the chest radiograph' that reflects a 'pleural effusion,' he fails to link that alleged standard with any specific breach." We disagree. Dr. Rhine specifically states that "Dr. Collins failed to diagnose the presence of a pleural effusion being associated with the patient's respiratory deterioration on the chest radiograph performed at 1942." He also states that Corina "would not have died during this neonatal hospitalization, but for the negligence of Drs. Stobie and Collins to timely address her developing pleural effusions that were evident in the infant's charting." We conclude that Dr. Rhine's report is sufficiently specific to (1) "inform [Dr. Owens-Collins] of the specific conduct [appellee] has called into question," and (2) "provide a basis for the trial court to conclude that [appellee's] claims have merit."[32]

We overrule Dr. Owens-Collins's second issue. Because we conclude Dr. Rhine's report constitutes a good-faith effort to comply with the statutory requirements, we need not address the adequacy of Dr. Sahn's report.[33]

---

[32] *See id.* at 879.

[33] *See* TEX. R. APP. P. 47.1.

14

### C. Dr. Stobie

In three issues, Dr. Stobie, a neonatologist, challenges: (1) Dr. Sahn's expert report on grounds that he lacks the qualifications to offer an expert opinion on the standard of care or breach of the standard for a neonatologist; (2) Dr. Rhine's expert report on grounds that it collectively refers to the conduct of Dr. Stobie and other physicians; and (3) both expert reports on grounds that they are "vague and conclusory as to breach of the standard of care and proximate cause."

Appellee responds that because Dr. Sahn is a recognized expert in pleural effusions—and the autopsy report confirms that Corina's death was caused by pleural effusions that resulted from the misplaced central line—Dr. Sahn is qualified to address issues in the area of pleural effusions resulting from extravasation of central lines. Appellee also contends that (1) Dr. Rhine's report clearly identifies the standard of care required of Dr. Stobie and the breaches of the standard by Dr. Stobie, and (2) both expert reports constitute a good-faith effort to comply with the requirements for an expert report. We begin with Dr. Stobie's challenge to Dr. Sahn's expert report.

### 1. Dr. Sahn's Report

### a. Challenge to Qualifications

As noted, Dr. Stobie contends that because Dr. Sahn is a pulmonologist, he is not qualified to testify on the standard of care or breach of the standard of care applicable to Dr. Stobie, a neonatologist.

Only a physician who satisfies specific requirements may qualify as an expert witness on the issue of whether another physician departed from accepted standards of

medical care in a health care liability claim against that physician for injury to a patient.[34]

Section 74.401 provides that, to be qualified as an expert, one must be a physician who

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.[35]

"Practicing medicine" "includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians."[36] In determining whether an expert is qualified on the basis of training or experience,

> the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:
>
> (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and
>
> (2) is actively practicing medicine in rendering medical care services relevant to the claim.[37]

To comply with section 74.401's requirements, the proponent of the expert's testimony has the burden to show "that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to

---

[34] *See* TEX. PRAC. & REM. CODE ANN. §74.401 (Vernon 2005).

[35] *Id.* § 74.401(a).

[36] *Id.* § 74.401(b).

[37] *Id.* § 74.401(c).

give an opinion on that particular subject."[38]

Dr. Sahn's report reflects that he is a licensed physician with three board certifications (internal medicine, pulmonary disease, and critical care medicine). Dr. Sahn's report states he is currently practicing medicine and that a major area of his research, practice, and teaching from 1973 to the present is the "study of pleural effusions . . . and other such pathologic sequelae of the placement of central venous catheters with resulting violation of the pleural space." Dr. Sahn states he has authored a "soon-to-be published chapter entitled: [']Pleural Effusions of Extravascular Origin,['] which includes a section on extravascular migration of central venous catheters, such as happened to Infant Corina in this case." Dr. Sahn states he is qualified to serve as an expert in this case based on his "education, training, experience, teaching and clinical supervision of medical students, residents, and pulmonary fellows, and extensive research activity for the past twenty-five years in the area of interest, identification, treatment, and preventive management of pulmonary complications in critical care, including pleuropulmonary sequelae of central venous catheters."

In his motion to dismiss, Dr. Stobie argued, among other things, that Dr. Sahn was not qualified to opine on the standard of care applicable to a neonatologist. By denying the motion to dismiss, the trial court rejected Dr. Stobie's argument. As the supreme court noted in *Larson*, "[t]he qualification of a witness as an expert is within the trial court's discretion. We do not disturb the trial court's discretion absent clear abuse. 'The test for

---

[38] *Broders v. Heise*, 924 S.W.2d 148, 153-54 (Tex. 1996) (quoting *Ponder v. Texarkana Mem'l Hosp.*, 840 S.W.2d 476, 477-78 (Tex. App.–Houston [14th Dist.] 1991, writ denied)); *see also* TEX. R. EVID. 702 (providing for testimony by expert witness qualified by "knowledge, skill, experience, training, or education").

abuse of discretion is whether the trial court acted without reference to any guiding rules or principles.'"[39] The *Larson* court also stated that in a "close call," the decision as to whether expert testimony qualifies must go to the trial court.[40] We hold that the trial court did not abuse its discretion in finding Dr. Sahn qualified to opine as an expert in this case. We overrule Dr. Stobie's first issue. We turn to Dr. Stobie's challenges to the adequacy of Dr. Sahn's expert report.

### b. Challenge to Adequacy of Report

Dr. Stobie contends Dr. Sahn's report is "conclusory as to the elements of breach of the standard of care and proximate cause." Specifically, Dr. Stobie argues the report is conclusory in stating that he failed to appropriately monitor Corina because it "fails to set forth a time when or how this monitoring should have been done, what it would have showed, and how the alleged failure to monitor the patient's status proximately caused injuries." Dr. Stobie also complains that the report is conclusory in saying that he failed to act promptly to assess and manage the cause of Corina's respiratory decompensation. Dr. Stobie states the report "fails to set forth a time when this assessment and management should have been done, what it would have showed, why Dr. Stobie was responsible for it, or how the alleged failure to do so proximately caused injuries in this case."

Dr. Sahn's report states, in pertinent part:

---

[39] *Larson v. Downing*, 197 S.W.3d 303, 304-05 (Tex. 2006) (quoting *Broders*, 924 S.W.2d at 151).

[40] *Id.* at 304; *see also Baker v. Gomez*, No. 08-06-00330-CV, 2008 Tex. App. LEXIS 531, at *10 (Tex. App.–El Paso Jan. 24, 2008, pet. denied) (holding physician board certified in internal medicine, pulmonary medicine, and critical care medicine qualified to render an opinion based on his report detailing experience in treatment of condition at issue).

Standard of care for Dr. Stobie:

The admitting neonatologist has primary responsibility for the care of the patient.  As such, the standard of care required that Dr. Stobie:

1.  Assess the infant upon admission and review the plan of care.

2.  Document the treatment plan for the patient.

3.  Continue to monitor the patient's progress in the NICU, making treatment decisions appropriate to her clinical status at each interval.

4.  Appropriately supervise the medical care being provided by the resident physicians to the patients in the NICU admitted under his care, including Infant Corina Gutierrez, so as to ensure that appropriate actions are followed based on the patient's clinical status.

5.  Review and discuss the nursing notes and test results ordered for the patient, including imaging reports, and provide appropriate medical treatment based on the patient's global clinical status, including information from tests and chart entries.

Negligence for Dr. Stobie:

1.  Dr. Stobie failed to appropriately monitor the patient's clinical status so as to be able to intervene in a timely manner to avoid a fatal outcome.

2.  Dr. Stobie failed to act promptly to assess and effectively manage the cause of the patient's respiratory decompensation.

Proximate Cause by Dr. Stobie:

It is my expert opinion that Dr. Stobie's failure to follow the standard of care, as noted in the preceding sections, for the care required by a neonatologist in the assessment and management of complications of a CVC were a proximate cause of Infant Corina Gutierrez's premature death as a direct result of her acute respiratory failure and cardiac failure caused by the bilateral effusions that were a foreseeable consequence of extravascular migration of the CVC.

The admission and autopsy notes indicate that the only abnormality that Infant Corina Gutierrez had was her gastroschisis and bowel atresia, which Dr. Patel repaired.  Having completed that repair, the baby should have progressed through recovery to discharge home and her death was entirely preventable.  However, the leakage of TPN fluid through the malpositioned

19

central venous catheter into her pleural space, as a result of Dr. Stobie'[s] negligence, directly caused her acute respiratory failure and cardiac failure, and premature death.

We conclude that Dr. Sahn's report is sufficiently specific to (1) inform Dr. Stobie of the specific conduct appellee has called into question, and (2) provide a basis for the trial court to conclude that appellee's claims have merit.[41] We overrule Dr. Stobie's third issue. We hold the trial court did not abuse its discretion in determining that Dr. Sahn's report constitutes a good-faith effort to comply with the statutory requirements for an expert report.[42] Because we conclude Dr. Sahn's report constitutes a good-faith effort to comply with the statutory requirements, we need not address the adequacy of Dr. Rhine's report.[43]

## V. Conclusion

We hold that the trial court did not abuse its discretion in denying the motions to dismiss filed by appellants, Dr. Patel, Dr. Owens-Collins, and Dr. Stobie. We affirm the trial court's order denying appellants' motions to dismiss.

LINDA REYNA YAÑEZ,
Justice

Memorandum Opinion delivered and filed
this the 30th day of October, 2008.

---

[41] *See Palacios*, 46 S.W.3d at 879.

[42] *See id.*

[43] *See* TEX. R. APP. P. 47.1.

20