
SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CR-16-344

| | |
|---|---|
| | **Opinion Delivered** November 30, 2016 |
| TERRANCE WASHINGTON<br>APPELLANT | APPEAL FROM THE CRITTENDEN<br>COUNTY CIRCUIT COURT<br>[NO. CR-13-1091] |
| V. | |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE JOHN N.<br>FOGLEMAN, JUDGE |
| | AFFIRMED |

## BRANDON J. HARRISON, Judge

A jury convicted Terrance Washington of grievously injuring then three-month-old T.W. by violently shaking him. Washington was sentenced to 10 years' imprisonment. He appealed the sentencing order and now argues that the circuit court erred when it admitted an unauthenticated CT scan of T.W.'s brain and refused him the opportunity to obtain testimony from his own mother, and another witness, that T.W.'s mother may have injured the baby.

*Was the Computed Tomography (CT) Scan of T.W.'s Injured Brain Properly Authenticated?*

Washington does not argue that the State failed to prove beyond a reasonable doubt that he committed a first-degree battery against baby T.W., so it is enough to report that T.W. was taken to LeBonheur Children's Hospital in Memphis, Tennessee, on 23 November 2013, after his mother, Dominique Roberts, called 911. A few days later, T.W. was diagnosed as being a victim of a "severe shaking episode" by child-abuse specialist Dr.

Karen Laken. Given the severity of his head injuries, hospice care was arranged. But T.W. survived, though he is now nourished through a feeding tube, and suffers from seizures and cerebral palsy.

Dr. Laken was not only a consulting doctor on T.W.'s case at LeBonheur; she also appeared as an expert witness for the State during Washington's criminal trial. On direct examination, the doctor testified that, before the trial, she had reviewed medical records from T.W.'s hospitalization and follow-up outpatient evaluations related to his physical and occupational therapies. The doctor made clear that she had relied on medical records of other doctors and nurses when she formed her opinion, all of which is information an expert in her field might commonly rely on. While on the stand, Dr. Laken said that T.W. experienced an acute subdural hemorrhage on the right side of his brain, explained the physiology behind the condition, its effect on his health, and that it was a traumatic injury given the child's clinical presentation. The doctor also told the jury about a special type of fracture that T.W. had suffered in his right femur—an atypical "chip" fracture consistent with "torsional action" a limb may undergo when a child is violently handled. Apart from Dr. Laken's testimony about the fracture, an X-ray of T.W.'s injured leg was received as evidence, without objection, during the State's case-in-chief. Washington did, however, object to the admission of State's Exhibit 11, a paper copy of a CT scan of a human brain.

Dr. Laken identified Exhibit 11 (a black-and-white paper copy) as being a CT scan of T.W.'s injured brain and agreed that it would help the jury understand the acute trauma he had suffered. Washington objected to the exhibit based on chain of custody, lack of authentication, and hearsay. The circuit court then asked the State to further lay a

foundation. When questioned by the prosecutor, Dr. Laken said that she "believed" the image was taken on November 24, that it was part of T.W.'s medical record, and that she had examined him on November 26. She also said that the image was normally used and relied on by doctors handling a case like T.W.'s. This colloquy occurred when Washington's attorney asked about the image:

| | |
|---|---|
| DEFENSE COUNSEL: | How do you know this is the medical records of [T.W.]? |
| DR. LAKEN: | These are the ones I just looked at before I came. |
| DEFENSE COUNSEL: | That's the only way you know that? |
| DR. LAKEN: | These are also the ones that I submitted to [the prosecutor]. |
| DEFENSE COUNSEL: | And where did you obtain them from? |
| DR. LAKEN: | From LeBonheur, from the records. |
| DEFENSE COUNSEL: | The custodian of the records? |
| DR. LAKEN: | I'm sorry? |
| DEFENSE COUNSEL: | From the custodian of records at LeBonheur? |
| DR. LAKEN: | No. We use electronic medical records. |
| DEFENSE COUNSEL: | Then you didn't, you didn't have anything to do with the taking of these? |
| DR. LAKEN: | No. The radiologist doesn't either. The radiology tech takes the x-rays. |
| DEFENSE COUNSEL: | And they take them and then they do what with them? |
| DR. LAKEN: | Put them in to the electronic medical records for the radiologist and all the physicians to have access to. |
| DEFENSE COUNSEL: | And then you obtained them off that? |
| DR. LAKEN: | That's it, yes. That's the only way we can do it. |

DEFENSE COUNSEL:        I object to them being introduced.

COURT:        All right. I'm going to overrule the objection. I find that the objection goes more to the weight of the evidence rather than its admissibility. It will be admitted, State's Exhibit 11.

Washington argues that there was "no testimony from any person who could establish that the CT scan, which was taken from the electronic medical records was, in fact, the CT scan of [T.W.] There was no testimony from the LeBonheur custodian of records by affidavit or otherwise." He cites a chain-of-custody case, *Crisco v. State*, 328 Ark. 388, 943 S.W.2d 582 (1997), Arkansas Rule of Evidence 901, and portions of the Hospital Records Act (Ark. Code Ann. §§ 16-46-305, 306) to support his argument. The State responds that CT scans are expressly excluded from the definition of "records," so the process for authenticating medical records under the statutes does not apply. It also argues that the circuit court properly admitted the CT scan under Arkansas Rule of Evidence 703.

On the legal authority, the State is partially correct. The applicable rule for the CT scan issue is Arkansas Rule of Evidence 901, not 703. The former rule is the one that addresses the need to authenticate a document before it may be admitted as evidence. And it states in part that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ark. R. Evid. 901(a) (2016); *see also Davis v. State*, 350 Ark. 22, 39–40, 86 S.W.3d 872, 883 (2002) (discussing authentication).

Rule 901 further states, as previously summarized by our supreme court, "that the testimony of a witness with knowledge that a matter is what it is claimed to be can authenticate evidence, and also that appearance, contents, substance, internal patterns, or

SLIP OPINION

other distinctive characteristics, taken in conjunction with circumstances can be used to authenticate evidence." *Gulley v. State*, 2012 Ark. 368, at 13, 423 S.W.3d 569, 578; *see also* Ark. R. Evid. 901(b)(1) & (4). One subsection of the rule allows evidence to be authenticated by "[a]ny method of authentication or identification provided by [the Supreme Court of this State or by] a statute or as provided in the Constitution of this State." Ark. R. Evid. 901(b)(10). That subsection leads us to some statutes that many lawyers and judges will know as Arkansas's Hospital Records Act, which provides ways to authenticate medical records using records custodians. Here the State is correct on the law: the statute does not, for some unexplained reason, cover diagnostic images like CT scans. Under Ark. Code Ann. § 16-46-301(2)(B), the term "'records' shall not mean and include X rays, electrocardiograms, and similar graphic matter." So we remain with Rule 901 for the purpose of addressing the CT scan's authentication.

No party points this out, but it warrants mentioning that Rule 901 should be read with Rule 1001(2), which lumps X-rays with photographs. Because there is no good reason to treat an X-ray image differently from a computed tomography image for authentication purposes, the extension makes sense.

As a matter of historical interest, many years ago this court recognized that hard-and-fast rules regarding the admissibility of an X-ray would be unwise because

> [i]t is neither possible nor wise to establish specific foundational requirements for the admissibility of photographic evidence under the 'silent witness' theory, since the context in which the photographic evidence was obtained and its intended use at trial will be different in virtually every case. It is enough to say, that adequate foundational facts must be presented to the trial court, so that the trial court can determine that the trier of fact can reasonably infer that the subject matter is what its proponent claims.

*Fisher v. State*, 7 Ark. App. 1, 8, 643 S.W.2d 571, 575 (1982).  In keeping with this court's

pragmatic approach, today's opinion does not implement a static rule on the admissibility of

a diagnostic medical image like a CT scan.  Still, a handful of questions seem likely to arise

when medical images are at issue, especially with the widespread implementation of

electronically stored and accessed medical information.  *See, e.g.*, *Use of CAT Scans in*

*Litigation* 8 Am. Jur. Proof of Facts 3d 145 § 11 Authentication (discussing authenticating

modern medical-imaging scans, including computed tomography).

There is some concern on whether the image in this case was properly authenticated

before the circuit court received it as evidence against Washington for a few reasons:

- The image (a poorly reproduced paper copy at that) is not readily identifiable as being one of T.W.'s brain because there is no name, birthdate, or some other specific personal identifier on the reproduced image that links it to T.W.

- Dr. Laken said the image was of T.W.'s brain, but she did not order or conduct the scan; and no other medical-care provider corroborated who ordered it, who oversaw the scanning process, and most importantly, as we just said, that the image was actually T.W.'s brain.

- No witness described with particularity the process Dr. Laken used to access and retrieve T.W.'s electronic medical file, much less how the image was entered into the database in the first place; in other words, no one explained at all how CT images are handled to ensure the correct image is entered under the correct patient's medical file.

We need not decide if the CT scan was properly authenticated because even if it was not,

its admission would be a harmless error given the whole of Dr. Laken's testimony and the

multiple sources of medical information she relied on when giving her opinion—including

the X-ray of T.W.'s leg that the doctor used to show that he had a fracture consistent with

having experienced severe physical abuse.  *Rodriguez v. State*, 372 Ark. 335, 339, 276 S.W.3d

208, 212 (2008) (harmless-error doctrine). The circuit court is therefore affirmed on this point.

*Should Washington Have Been Allowed to Use "Reverse 404(b)" Character Evidence?*

During his defense at trial, Washington tried to introduce some "bad acts" of T.W.'s mother, Dominique Roberts. The goal was to inform the jury, through Washington's mother (Katina Hall), how Dominique had treated Washington and her children in the past. Washington's lawyer told the court he anticipated that Hall would testify about two events. One involved an incident when Dominique allegedly jumped on Washington at their house; the second incident involved Dominique placing T.W.'s sibling at the door step, ringing the doorbell, and leaving the child on the front porch.

Washington's lawyer also told the circuit court that he had a witness, whose name is not mentioned, who could testify that "he saw her shaking [T.W.]." No additional details were provided during the proffer of the unnamed witness.

When asked about the purpose and relevancy of the proffered testimony, Washington's lawyer answered that it was allowed under Rule 404(b) and relevant to Dominique's knowledge, temperament, and that "she was with [T.W.] right before she left and it shows that she's got a tendency to be violent or have anger problems." The circuit court allowed Hall (Washington's mother) to testify about Washington's education but did not allow her to testify about Dominique, because Washington had not stated that Dominique had an "angry outburst" or "a rage" directed toward T.W. Nor did the court permit Washington's unnamed witness to testify that Dominique had previously shaken T.W. The circuit court also stated,

[T]he testimony that's before the Court now doesn't suggest anything about anything she might have done or anything of the baby crying or anything that would suggest . . . this is a little more dealing with evidence of possible guilt of other people, and there always has to be something more than he had a speculation or conjecture.

Here is the rest of the colloquy:

| | |
|---|---|
| DEFENSE COUNSEL: | [M]y other witness that's supposed to be here, that's what he's going to testify to is he saw her shaking [T.W.] . . . It falls under, it doesn't fall under 404(b)? |
| COURT: | If he [Washington] had said he had heard the baby crying and all of a sudden the baby stopped and he wasn't in the room, you know, just before she left, something like that, that would be one thing . . . But the testimony has been that she fed him and put him down. |
| DEFENSE COUNSEL: | And he [Washington] couldn't wake him. |
| COURT: | Yeah, after she left couldn't wake him, but there was nothing about the baby crying or about her being angry or doing anything, not hearing anything. And I mean, nothing to suggest that she might have done it. |
| DEFENSE COUNSEL: | Well, except for the fact that she was the last one to have him before he could, he wouldn't wake. |
| | . . . . |
| COURT: | I'm not going to allow it. |

Under Rule 404(b), evidence of other crimes, wrongs, or acts by a party other than the defendant may not be admitted to show that the party acted in conformity with a known character trait, but the evidence may be admitted for other purposes—such as to show motive, opportunity, intent, identity, a plan, knowledge, or absence of a mistake or accident. Ark. R. Evid. 404(b) (2016); *Price v. State*, 365 Ark. 25, 223 S.W.3d 817 (2006).

In his brief, Washington characterizes his argument as being a "reverse 404(b)" argument, which means he essentially wanted to use prior alleged bad conduct by Dominique (T.W.'s mother) to establish that she had a propensity for irresponsible and, more importantly, violent behavior against T.W. and was therefore inclined to physically harm T.W. the day he received emergency medical treatment. For "reverse 404(b)" evidence to be admissible, the alleged prior wrongs by someone other than the targeted defendant must be so closely connected in time and method that the evidence can cast doubt upon whether the defendant committed the crime. *See Tomboli v. State*, 100 Ark. App. 355, 361–62, 268 S.W.3d 918, 922 (2007).

The testimony Washington sought to have admitted is character evidence that Rule 404(b) and the case law prohibits. Given the record before us and the standard of review we must apply to this issue, *Conte v. State*, 2015 Ark. 220, 463 S.W.3d 686 (abuse of discretion), we hold that the circuit court did not err when it excluded the proffered testimony. The circuit court's sentencing order is therefore affirmed.

Affirmed.

HOOFMAN, J., agrees.

GRUBER, J., concurs.

**RITA W. GRUBER, Judge, concurring.** I agree with the majority's decision to affirm this case but write separately to express my belief that the CT scan of T.W.'s brain was properly authenticated. The majority opinion correctly notes that Arkansas Rule of Evidence 901 applies to the authentication of the CT scan in question in this case. The opinion further points out that Arkansas Rule of Evidence 1001(2) lumps x-ray films with

9

SLIP OPINION

photographs and states that "there is no good reason to treat an x-ray image differently from a computed tomography image for authentication purposes." I agree. Where I differ is that, for purposes of proving the content of the evidence a party seeks to introduce, Arkansas Rule of Evidence 1001(3) defines an "original" as the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it. The rule further states that if data is stored in a computer or similar device, an "original" is any printout or other output readable by sight and shown to accurately reflect the data. The printout of the CT scan introduced by the trial court and authenticated by a witness with knowledge, Dr. Laken, falls within the definition of an "original" under subsection three of Arkansas Rule of Evidence 1001.

While not specifically dealing with medical images, our supreme court has held that electronic messages are properly authenticated under Arkansas Rule of Evidence 901 when circumstantial evidence ties the party to the messages. *Donley v. Donley*, 2016 Ark. 243, at 14, 493 S.W.3d 762, 770 (citing *Gulley v. State*, 2012 Ark. 368, at 15, 423 S.W.3d 569, 579). The supreme court has also held that "screenshots" of comments on a Facebook photograph were properly authenticated when a witness testified that the comments were made using her Facebook account. *Id*. In *Dirickson v. State*, 104 Ark. App. 273, 278, 291 S.W.3d 198, 201 (2009), this court held that an officer's testimony was sufficient to authenticate "printouts" of internet conversations with a defendant. In *Buffalo v. State*, 2010 Ark. App. 127, at 8, 374 S.W.3d 82, 87, this court held, again, that an officer's testimony was sufficient to authenticate printouts of an "online chat" with a defendant.

Given our rules of evidence and caselaw, I believe Dr. Laken's testimony explaining how she obtained the CT scan electronically was sufficient to authenticate the scan, and the court did not err in admitting it into evidence. For the above stated reasons, I concur in the majority's decision.

*Bryan Donaldson*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.